*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0322p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-1610

MICHAEL AYOUB,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-81013—George C. Steeh, District Judge.

Argued: July 24, 2007

Decided and Filed: August 16, 2007

Before: COLE and GILMAN, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jonathan M. Epstein, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Jeanine M. Jones, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Jonathan M. Epstein, Bradley R. Hall, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellant. Jeanine M. Jones, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

R. GUY COLE, Jr., Circuit Judge. Defendant-Appellant Michael Ayoub appeals his federal convictions for being a felon in possession of a firearm and for possessing marijuana with intent to distribute it. He contends that (1) the evidence should have been suppressed, because the officers who searched his parents' home without a warrant did not obtain valid consent for the search; (2) the convictions must be reversed because stipulations to essential elements of the charges were never admitted into evidence; and (3) evidence of his prior drug-related activity was unduly prejudicial and, therefore, improperly admitted as evidence of prior bad acts under Federal Rule of Evidence 404(b). As discussed below, each of these contentions is without merit. We therefore **AFFIRM**.

_____

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

# I. BACKGROUND

On August 11, 2004, Department of Homeland Security Special Agent Corey Howe received information from Ayoub's half-brother, Antonio Puzai, that Ayoub was engaged in drug activity at Ayoub's parents' house on Steadman Street in Dearborn, Michigan. Ayoub's parents, the owners of the home, were in Lebanon.

Agent Howe contacted Dearborn Police Officer Luke Cosenza to arrange surveillance of the Steadman Street house. During the surveillance, officers saw Ayoub at the home. When he left in his car, Dearborn Police pulled him over in a traffic stop. Ayoub consented to a search of his person and his car, but the police found no contraband, and he was allowed to leave. The officers did not ask Ayoub for consent to search the home.

Puzai told the officers that his sister (Ayoub's half-sister), Raja Atoui, was in control of the home and had a key. Agent Howe, Officer Cosenza, and Puzai went to Atoui's home to seek her consent to search her parents' home. The officers spoke with Atoui, and her daughter translated at least some of the conversation. The officers confirmed that Atoui was the caretaker of her parents' home while they were in Lebanon. She signed a consent-to-search form and provided the officers with a key to the home.

The officers proceeded to the Steadman Street house and entered. During the search, they located drug paraphernalia, scales, bowls, plastic bags, cutting agents, and other materials used to package drugs. The officers also found a Llama .380 handgun and a Bryco .9mm handgun. In the garage, they found approximately one pound of marijuana in the rafters.

As the officers were removing the marijuana from the rafters, Ayoub arrived in his car. Ayoub exited his car, removed his shirt, and spun around in circles, proclaiming, "The weed is mine. Take me to jail. You ruined my life." (Joint Appendix ("JA") 307.) Officers arrested Ayoub and took him to the Dearborn Police Department. Agent Howe and Officer Cosenza returned the key to Atoui and then went to the police station. Ayoub waived his *Miranda* rights and told the police that he bought the marijuana several days earlier for $800. He also stated that he bought the handguns approximately one year earlier. He then wrote out a statement admitting that he owned the marijuana and the firearms.

A two-count indictment charged Ayoub with (1) being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)), and (2) possession with intent to distribute marijuana (18 U.S.C. § 841(a)(1)). Ayoub moved to suppress the evidence found at the home, contending that the search was improper. Ayoub also moved to suppress evidence of his 2001 guilty plea to attempted possession with intent to distribute a controlled substance. The district court denied these motions.

On November 15, 2005, the first day of trial, the Government advised the district court of proposed stipulations regarding the toxicology of the narcotics (i.e., that the substance was marijuana), the interstate nexus regarding the firearms, and Ayoub's 2001 conviction. The stipulations were never admitted into evidence, but the court referenced two of them (interstate nexus and prior felony) in the jury instructions. Additionally, Ayoub's counsel referenced Ayoub's prior conviction during jury selection, and the Government presented testimony regarding the underlying facts of that prior conviction for the purposes of showing that the marijuana in the present case belonged to Ayoub and that he intended to distribute it. Ayoub's written confession stating that the substance was marijuana was entered into evidence, and Ayoub's counsel repeatedly referred to the substance as marijuana when cross-examining Agent Howe. The jury convicted Ayoub on both counts, and the district court sentenced him to fifty-five months in prison. Ayoub timely appealed.

## II. DISCUSSION

As stated, Ayoub challenges his conviction on three grounds. First, he contends that the search revealing the guns and drugs was invalid. Second, he contends that the evidence was insufficient to support his conviction. Finally, he contends that evidence of his prior drug crime was improperly admitted under Fed. R. Evid. 404(b). We discuss each contention in turn.

### A.      The Search

Ayoub argues that the search of his parents' home was invalid and that the district court should have accordingly granted his motion to suppress the evidence discovered there. He says that Atoui lacked authority to consent to the search. He also contends that, even if she had this authority, she did not voluntarily consent.

When reviewing a district court's denial of a suppression motion, we accept the district court's factual findings unless they are clearly erroneous, and we consider its legal conclusions de novo. *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000).

The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Payton v. New York*, 445 U.S. 573 (1980), and *Johnson v. United States*, 333 U.S. 10 (1948)). The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, *id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)), or "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected," *Matlock v. United States*, 415 U.S. 164, 171 (1974).

Common authority is not to be implied "from the mere property interest a third party has in the property, . . . but rests on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *Id.* at 171 n.7. "The burden of establishing that common authority rests upon the State." *Rodriguez*, 497 U.S. at 181. The exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citing *Rodriguez*, 497 U.S. at 186). In other words, a search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had apparent authority to consent to the search. *See Rodriguez*, 547 U.S. 186–89. But if a potential defendant with self interest in objecting to the search is present and actually objects, then a third party's permission does not suffice for a reasonable search. *Randolph*, 547 U.S. at 121. If that potential objector is "nearby but not invited to take part in the threshold colloquy," on the other hand, that potential objector "loses out," and the search will be deemed valid. *Id.*

Applying these principles here, we conclude that Atoui had authority to consent to the search, and that the district court did not err in concluding that she voluntarily provided that consent.

### 1.      *Atoui Had Authority (or Apparent Authority) to Consent*

Helpful to assessing Atoui's authority to consent here—especially in light of Ayoub's asserted superior possessory interest in the searched home—is our decision in *United States v. Jones*, 335 F.3d 527 (6th Cir. 2003), where we concluded that officers lacked lawful authority to enter a home. Federal officers had information that the defendant possessed firearms and drugs and was wanted on an outstanding federal arrest warrant. *Id.* at 529. An officer pulled the defendant over in his car and arrested him on the federal warrant. *Id.* The defendant refused to consent to a search of his home. *Id.* As a result of surveillance conducted before the arrest, the officers knew that two

other individuals were at the defendant's home.  *Id.*  The officers had observed a man, later determined to be an overnight guest named Dickason, working on a car in the driveway, and a second man, later determined to be one Teasley, bringing food and water to dogs that were living at the home.  *Id.*  Two officers went to the home to identify these individuals.  *Id.*  Teasley let one of the officers inside the home, where the officer saw Dickason.  *Id.* at 530.  After some questioning, Dickason allowed the officer to look for Dickason's identification in a duffel bag in a back bedroom.  *Id.*  While in the bedroom, the officer saw firearms and, in the duffel bag, a pipe for smoking crack cocaine.  *Id.*  After being convicted on this evidence, the defendant contended on appeal that "neither Teasley nor Dickason, both of whom had lesser possessory rights to the premises than [he did], could give lawful consent for the officers to enter the premises."  *Id.*

We agreed.  We explained that Teasley, who first let the officer inside the home, was simply a "handyman," and therefore the defendant's employee.  *Id.*  (We noted, however, that even if he were an overnight guest, such as Dickason, the outcome would be the same.  *Id.*)  We explained that courts "have engaged in a fact-specific analysis of the level of responsibility given to the employee" when assessing whether the employee has authority to consent to a search of a residence.  *Id.* at 531.  "If the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found."  *Id.*

We first noted that Teasley "clearly lacked actual authority" to permit the officer to enter the residence.  *Id.*  "His authority, even assuming that he had any, would have ceased at the point that [the defendant] denied consent to a search . . . ."  *Id.*  We stated that, although an employee "does in some instances have sufficient authority to consent to entry into or a search of his employer's residence, the lesser, and necessarily derivative, interest of the employee cannot override the greater interest of the owner."  *Id.*  "When the primary occupant has denied permission to enter and conduct a search, his employee does not have the authority to override that denial."  *Id.* (citing *United States v. Impink*, 728 F.2d 1228, 1234 (9th Cir. 1984) ("[W]hen police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain.")).

We then concluded that no reasonable person would have believed that Teasley had apparent authority to consent to the entry and search.  *Id.* at 532.  We explained that the officer knew that Teasley "was simply a handyman."  *Id.*  "This fact," we continued, "combined with the defendant's prior denial of consent to a search, made it impossible for a 'man of reasonable caution' to believe that Teasley had the authority to consent to a search of the residence, or even to permit entry."  *Id.*  Accordingly, we held that the warrantless entry was unlawful.  *Id.*

The preliminary question before us is whether Atoui had authority to consent to a search of her parents' home while they were in Lebanon, regardless of Ayoub's interest in the home.  Agent Howe testified that the informant, Puzai, told the officers that Atoui was "the person who had actual control of the house, as far as who goes in and out, [and] makes sure there's nothing wrong going on at the house . . . ."  (JA 101.)  Agent Howe further testified that he learned, when talking to Atoui, that she "did in fact have control over the residence while her parents were in Lebanon, and she had a key to open and lock the door."  (JA 102.)  Additionally, Officer Cosenza acknowledged in his testimony that "she confirmed that she was the care taker of the home."  (JA 146.)  He explained that she confirmed that her parents were in Lebanon and that "she was given, basically custodial care of the home."  (JA 146–47.)  "She had the keys, she was the person dealing with the home."  (JA 147.)  Officer Cosenza also explained that she lives one block from her parents' home.  The district court accordingly found that Atoui "provided confirmation of her own authority to consent" and that this confirmation provided, at a minimum, "apparent authority as the caretaker . . . ."  (JA 154.)  The court added, "just the fact that she had the key would tend to support such an inference on the part of the officers when combined with the statements made to them by Mrs. Atoui at her residence."  (JA 154.)

The district court reasonably concluded that Atoui had authority to consent to a search of the home. As mentioned, we noted in *Jones* that, although the handyman there—present on only a limited basis—could not consent to a search, "[a] caretaker left in charge of a home for several weeks, for example, might have authority to permit entry . . . ." 335 F.3d at 531. Here, not only was Atoui the caretaker of the home during the time her parents were in Lebanon,[1] she of course also has greater authority than a typical employee as the daughter of the homeowners who were not occupying the premises at the time. As a leading treatise explains,

> [i]t has been held that where the guest was the married daughter of the hosts and was considered to be in charge of the premises during her parents' temporary absence, the guest's consent was effective. And even when there is not such a *family relationship*, the guest's consent may suffice if the host was away from the premises for a significant period of time and had left the guest in full charge.

5 Wayne R. LaFave, Search and Seizure, § 8.6 (4th ed. 2004) (citing *Garr v. Commonweath*, 463 S.W.2d 109 (Ky. App. 1971), and *Morrison v. State*, 508 S.W.2d 827 (Tex. Crim. App. 1974)). Atoui's role during her parents' absence thus distinguishes her from mere handymen, landlords, hotel staff, or former tenants who—though perhaps having keys and limited access to a residence—lack common authority over the residence. *See, e.g.*, *Chapman v. United States*, 365 U.S. 610 (1961) (landlord lacks authority to consent to search); *Stoner v. California*, 376 U.S. 483 (1964) (hotel manager); *Rodriguez*, 497 U.S. at 181 (holding that former occupant who moved out of residence nearly a month before the search and possessed a key did not have authority to allow search where she never went to residence when owner was not present).

Having established that Atoui possessed authority to consent to a search of her parents' home, the next question is whether Ayoub's asserted possessory interest in the home eliminated Atoui's authority to consent to the search. Even assuming that Ayoub had a possessory interest in the home and that it was greater than Atoui's—a colorable assumption, as he was seen going to and from the house—he never cut off Atoui's authority to consent to the search. Unlike the defendant in *Jones*, Ayoub never denied consent. *See Jones*, 335 F.3d at 531 (stating that handyman's authority to consent "would have ceased at the point that [defendant] denied consent"); *see also United States v. Elam*, 441 F.3d 601, 604 (8th Cir. 2006) ("[W]e have acknowledged (but never invoked) intentional bypass as a narrow exception to the Supreme Court's third party consent principles, explaining that 'police may not rely on a third party's consent to intentionally bypass a person who is present, has a superior privacy interest in the premises, and *actively objects* to the search.'") (quoting *United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998) (emphasis added)); *United States v. Brokaw*, 985 F.2d 951, 954 (8th Cir. 1993) ("[A]though appellant was present at the time of the search, there is no evidence that he objected to the search or that he was 'intentionally bypassed' by the officers."); but *see Hembree v. Tennessee*, 546 S.W.2d 235, 241 (Tenn. Ct. Crim. App. 1976) ("We hold that when parents are in custody of the law along with their son and are equally accessible to give or withhold consent to search, the consent and cooperation to a search by the son does not waive constitutional rights of his parents.").

To be sure, we find it curious that the officers never asked Ayoub for consent to search, though they had every opportunity—especially when they pulled him over as he left the house. Indeed, one might suspect that the officers believed that Ayoub would deny consent and they instead went to Atoui, even though she may have had a lesser possessory interest in the home. Worse, the officers failed simply to get a search warrant, which—given the information they possessed before the consent search—they had ample time to secure. That would have been the preferred course in

---

[1] The United States noted at oral argument that Atoui's parents were out of the country for four months.

light of the Fourth Amendment's strong partiality to searches conducted pursuant to a warrant. *See Randolph*, 547 U.S. at 117 (noting "the law's general partiality toward 'police action taken under a warrant [as against] searches and seizures without one'") (citation omitted) (alteration in original); *Impink*, 728 F.3d at 1231 ("Where the police have ample opportunity to obtain a warrant, we do not look kindly on their failure to do so.").

Nonetheless, the Supreme Court recently made clear that a consensual search will stand where a potential objector, such as Ayoub, never refused consent—even if he was available. *See Randolph*, 547 U.S. at 121 (concluding that an objector who is present and actually objects to a search trumps a third party's authority to consent, yet the potential objector who is "nearby but not invited to take part in the threshold colloquy"—even if in a police car near the scene (as in *Matlock*) or asleep inside the residence (as in *Rodriguez*)—"loses out"); *see also United States v. Wilburn*, 473 F.3d 742, 744–45 (7th Cir. 2007) (finding valid third-party consent where potential objector was kept in squad car 40 feet from residence because "the police were not obligated to bring [him] to [the consenting party] so he could be a party to the discussion regarding consent"); *United States v. Alama*, No. 06-2970, 2007 U.S. App. LEXIS 12018, at *7–9 (8th Cir. May 23, 2007) (finding valid third-party consent where potential objector remained hidden inside home when officers knocked on door).

Consent is valid in these circumstances "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Randolph*, 547 U.S. at 121. Here, though the officers had the opportunity to ask Ayoub for consent, they did not "remove" him "from the entrance" of the home to avoid his possible objection. *See United States v. Reed*, No. 3:06-CR-75, 2006 U.S. Dist. LEXIS 57666, at *12 (D. Ind. Aug. 3, 2006) (noting that the *Randolph* Court's requirement "that the objector be 'at the door' is underscored by the care with which the Court crafted its opinion," referring always to one who "'is present at the scene and expressly refuses to consent'"). Additionally, Atoui never stated that she desired to obtain Ayoub's consent to search. *Cf. United States v. Groves*, 470 F.3d 311, 321 (7th Cir. 2006) (remanding in light of *Randolph* where officer admitted that he waited to search until potential objector was not home, where consenting party stated that she repeatedly asked to call objector, and where parties did not focus on whether the officers procured objector's absence for purpose of avoiding an objection). In short, because Ayoub was not present and objecting, Atoui had authority to consent to the search.

Because Atoui had actual authority to consent to the search, it is not necessary to consider whether she had apparent authority. In any event, that analysis would largely overlap with the actual-authority analysis because the officers' impressions of the facts largely coincided with the objective facts. In other words, this is not a case in which a person lacks actual authority but the facts nonetheless could have provided the officers reasonable basis to believe that authority existed. *See, e.g.*, *Rodriguez*, 497 U.S. at 181–82, 189 (concluding that former occupant with key who moved out lacked authority to consent to search owner's apartment but remanding for consideration of whether officers had a reasonable belief that she had that authority). Additionally, as discussed, Ayoub was not present and objecting at the time of the search—something that would otherwise suggest the officers acted unreasonably. *Cf. State v. Buhler*, 52 P.3d 329, 332 (Idaho Ct. App. 2002) ("The fact that . . . the person who was known to be renting the room was present and was refusing to allow entry[] is a significant factor in assessing the reasonableness of the officers' reliance upon [another person's] consent."); *State v. Benson*, 983 P.2d 225, 233 (Idaho Ct. App. 1999) (holding that officers' reliance on apparent authority was unreasonable where they relied on third-party consent despite objectors' "strong vocal objections," which showed that the officers knew "full well that they could not obtain such consent from either [objector]"). Finally, lesser showings of apparent authority than Atoui provided here have sufficed to validate a search. *See, e.g.*, *United States v. Gillis*, 358 F.3d 386, 392 (6th Cir. 2004) (apparent authority where ex-girlfriend had no key and

used another residence).  In short, at a minimum, Atoui had the apparent authority to consent to the search.  The next question is whether she actually did so.

2.        *Atoui Voluntarily Consented*

"[T]o justify a search by consent, the government must prove by 'clear and positive testimony' that the asserted consent was 'voluntary' and 'unequivocally, specifically, and intelligently given.'"  *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006) (quoting *United States v. Worley*, 193 F.3d 380, 385–86) (6th Cir. 1999)).

The officers spoke with Atoui at her house to obtain her consent to search.  Also present were Puzai and Atoui's daughter, who was approximately sixteen years old.  Agent Howe testified that "[o]bviously [Atoui's] native language is not English," but "she was able to give her name in English and [the officers] had help with the interpretation from her daughter at the time . . . who helped [them] translate more specific[ally] about the consent search."  (JA 102–03.)  Agent Howe also stated that Puzai "might have helped a little" with translation, but the "majority of the help came from the daughter of Ms. Atoui."  (JA 118.)  "There was no doubt," Agent Howe testified, that Atoui "had English ability."  (JA 126.)  When asked whether it appeared that she understood what was going on, Agent Howe responded, "Fully?"  (JA 103.)  Yet he explained that her demeanor was "cooperative, understanding."  (JA 103.)  Agent Howe then explained that she signed the consent form, and she was not threatened or forced in any way to do so.  He further testified that Atoui "nodded her head in understanding and said [']I understand['] and she could speak English and write in English and [the officers] asked her daughter[,] who spoke English just fine[,] to interpret for her and she did."  (JA 127.)

Officer Cosenza testified similarly.  He explained that Atoui understood what the officers were saying and did not appear upset or distraught.  Officer Cosenza further explained that they "had no problem communicating and she spoke, although broken, [they] understood each other, no problem."  (JA 141.)  He further stated that Atoui's daughter "did no interpretation for [him]."  (JA 144.)  He and Atoui "had a conversation, and [he] didn't need interpreting, [he] understood her just fine and she understood [him] just fine."  (JA 144.)

The district court accordingly found that "the testimony was that Ms. Atoui was able to communicate in English without significant assistance on the part of either her daughter or the family-member confidential informant who was standing by and that her demeanor was calm, that there were no threats or coercion employed and that they explained to Ms. Atoui the purpose for their request to search the premises on Steadman."  (JA 153.)  Additionally, the court explained that the officers "further testified that . . . Atoui provided them with a key and permission to search the property."  (JA 153.)  The court then stated that "the totality of the surrounding circumstances demonstrate that the consent by Mrs. Atoui was in fact voluntarily given, not the result of threat or coercion either expressed or implied and that she was sufficiently understanding of the request to consent . . . ."  (JA 154.)

Ayoub argues, however, that the Government failed to show valid consent.  He notes that, although Agent Howe testified that Atoui's daughter translated, Officer Cosenza testified that he was able to communicate directly with Atoui.  Ayoub further notes that Puzai testified that he translated the consent form to Atoui.  Ayoub also contends that because the consent form was in English, its validity is questionable.  He additionally explains that Atoui's daughter later testified at trial that Atoui was "scared" and "shaking" and never spoke directly to the officers.  (JA 629.)

Ayoub's contentions fail because the district court's decision that Atoui validly consented was based on credibility determinations of the witnesses.  *See United States v. McNeal*, 955 F.2d 1067, 1071 (6th Cir. 1992) ("The trial court's decision was expressly anchored in credibility

evaluations of witnesses who testified during the suppression hearing, and accordingly is beyond appellate review."). In short, the court credited the officers' accounts that Atoui understood that she was consenting to the search. And Officer Cosenza's testimony that Atoui's daughter did not translate *for him* is not necessarily contradictory to Agent Howe's testimony that she did some translating during the discussion. Moreover, regardless of the extent to which the daughter translated, there was sufficient testimony that Atoui understood what was occurring. The district court reasonably concluded that Atoui's consent was voluntary and unequivocally, specifically, and intelligently given.

## B.     Sufficiency of Evidence

Ayoub next contends that the evidence was insufficient to convict him of both charges. The heart of his claim is that, although he stipulated to various elements of the charges, these stipulations were never entered into evidence.

To convict a defendant for being a felon in possession of a firearm, the Government must prove three elements: (1) the defendant had previously been convicted of a felony; (2) the defendant knowingly possessed a firearm; and (3) the firearm traveled in interstate commerce. *See* 18 U.S.C. § 922(g)(1). Ayoub stipulated prior to trial to the first and third elements: he is a convicted felon and the firearm traveled in interstate commerce.

To convict a defendant for possession with intent to distribute marijuana, the Government must prove three elements: (1) the defendant possessed marijuana; (2) the defendant knew it was marijuana; and (3) the defendant intended to distribute the marijuana. *See* 18 U.S.C. § 841(a)(1). Ayoub stipulated prior to trial to a toxicology report establishing the first element: that the substance at issue was marijuana.

The district court was advised of these three proposed stipulations, but the final stipulations were never marked as exhibits nor read or presented to the jury. Thus, Ayoub says, no reasonable jury could have convicted him of these two charges beyond a reasonable doubt, because there was no evidence on the essential elements covered by the stipulations. The Government contends that Ayoub has waived this argument and that, in any event, the jury properly found the essential elements.

### 1.     *Waiver*

The Government first contends that Ayoub "failed to argue for dismissal under Rule 29" at trial and that we accordingly are limited to reviewing whether the failure to introduce the stipulations into evidence amounted to plain error resulting in a manifest miscarriage of justice. (Gov't Br. 11.) Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. Although Ayoub phrased his motion at the close of the Government's case as a "motion to dismiss based on lack of probable cause" and focused on the reliability of the informant and the alleged illegality of the search, the district court noted that Ayoub's argument also "dealt with the evidence that's been adduced during the government's presentation [at trial]," and therefore construed Ayoub's motion as a "motion for judgment of acquittal under Rule 29" based on insufficient evidence. (JA 497.) Therefore, we conclude that Ayoub moved under Rule 29 for a judgment of acquittal.

The Government further argues that, even if Ayoub moved under Rule 29, because that motion related only to the informant and the search and not to the sufficiency of evidence, he has waived his sufficiency argument. (Gov't Br. 13 (citing *United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993) (holding that where a Rule 29 motion is made on specific grounds, all grounds not specified are waived)). Because Ayoub did not mention the stipulations when making this Rule 29

motion, one could argue that he has waived his argument that their absence shows insufficiency of evidence. On the other hand, the district court viewed his challenge—at least generally—as one to the sufficiency of evidence and therefore one could say he has preserved this sub-argument regarding the stipulations. But we need not decide this question: even assuming that Ayoub preserved this argument, his sufficiency challenge, as discussed below, lacks merit.

    2.      *Sufficiency*

        In arguing that the failure to submit the stipulations into evidence requires reversal of his convictions, Ayoub relies on *United States v. James*, 987 F.2d 648 (9th Cir. 1993), in which the Ninth Circuit held that the Government's failure to introduce into evidence or otherwise present to the jury stipulations regarding essential elements required reversal of the defendant's conviction. Ayoub acknowledges, however, that there is contrary authority, such as *United States v. Branch*, 46 F.3d 440 (5th Cir. 1995), in which the Fifth Circuit held that the failure to introduce the stipulations did not require reversal. The Government does not discuss these cases; instead, it argues that the other evidence presented at trial was sufficient for the conviction. Neither party addresses how we might resolve the apparent conflict between cases such as *James* and *Branch*. Yet we have—when addressing a related issue in *United States v. Jones* (*Jessie Jones*), 108 F.3d 668 (6th Cir. 1997) (en banc) —strongly indicated that we would adopt the *Branch* approach and affirm a conviction such as the one here. Before discussing *Jessie Jones*, however, we first provide an overview of the two related rights at issue in these cases.

        Once a criminal defendant enters a plea of not guilty, the Fifth and Sixth Amendments to the Constitution entitle that defendant to at least two trial-related rights. *United States v. Hardin*, 139 F.3d 813, 815 (11th Cir. 1998) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (discussing the interrelated "Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict")). First, the "simple plea of not guilty . . . puts the prosecution to its proof as to all elements of the crime charged." *Id.* (quoting *Estelle v. McGuire*, 502 U.S. 62, 69–70 (1991)). Second, "the Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." *Id.* (quoting *United States v. Gaudin*, 515 U.S. 506, 511 (1995)). Ayoub invoked both of these rights when he pleaded not guilty. *See id.* His arguments focus on the first of these rights: the prosecution's burden to prove the elements. Our decision in *Jessie Jones* focused on the second of these rights—that a jury find these elements beyond reasonable doubt—but, in doing so, we indicated where we fall on the first.

        In *Jessie Jones*, our en banc Court affirmed a felon-in-possession conviction where the defendant stipulated that he was a prior convicted felon. 108 F.3d at 669–70. His defense at trial was that he never possessed a weapon. *Id.* at 670. At the close of evidence, the district court instructed the jury that, because of the stipulation, the convicted-felon "element of the offense has been proven." *Id.* The court further instructed the jury as follows: "Since defendant admits that he was previously convicted of a felony, *you will find* that the government has established this element of the offense . . . ." *Id.* (emphasis deleted). The defendant did not object to this instruction at trial, the jury returned a guilty verdict, and the defendant appealed. *Id.* He contended that this instruction violated the rule prohibiting a directed verdict for the prosecution, no matter how strong the evidence against the defendant. *Id.* at 671 (citing *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73 (1977)). In other words, he argued that the instruction violated his Sixth Amendment right to have the jury find him guilty of each element of the crime.

        We affirmed the conviction based on the defendant's failure to overcome plain-error review under Federal Rule of Criminal Procedure 52(b), which applies when the defendant does not object to the instruction at trial. *Id.* at 670. First, we noted that there is a split of authority regarding whether instructions that mandate that a jury find a stipulated element are impermissible, but

declined to decide that question and simply assumed that the instruction was erroneous. *Id.* at 671. Second, based on the conflicting case law, we concluded that the error was not plain, i.e., clear or obvious. *Id.* at 672. Third, even assuming the error were plain, we concluded that the error did not affect substantial rights because it did not affect the outcome of the trial as the defendant stipulated to and testified about his convicted-felon status. *Id.* Fourth, even assuming these three initial factors of plain-error review were present, we explained that the error could not have affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 672–73.

Six judges concurred in the judgment, concluding that the instruction amounted to plain error but agreeing with the majority on the final factor—that it did not result in a miscarriage of justice or affect the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 673 (Ryan, J., concurring). Before reaching these conclusions, however, the concurring opinion noted that "[w]hen a defendant agrees to a fact stipulation, the government is relieved of its burden to *prove* the stipulated fact." *Id.* at 674. The concurrence cited two cases for this proposition, including the Fifth Circuit's decision in *Branch*. *See id.* (also citing *United States v. Muse*, 83 F.3d 672, 678–79 (4th Cir. 1996)). The concurrence then explained that "when a defendant *stipulates* to certain facts, a trial judge may instruct the jury that those facts may be considered *proved* by the government . . . ." *Id.* Having established this preliminary point, the concurrence then reached the main question at issue, holding that the district court's further instruction that the jury "*will find* that the government has established this element of the offense" was erroneous because it directed a verdict against the defendant on this element. *Id.*

In light of the *Jessie Jones* concurring opinion relying on *Branch* to conclude that "when a defendant stipulates to certain facts, a trial judge may instruct the jury that those facts may be considered *proved* by the government . . . ," *id.* at 674, we conclude that when that instruction occurs, the stipulation itself need not be put into evidence. The majority never disputed this preliminary point, and it provided no indication that it would disagree. *Cf. Yanovitch v. United States*, 985 F. Supp. 17 (D. Mass. 1997) (citing both *Branch* and the *Jessie Jones* concurrence when noting that "several other circuits are in accord" with the view that "a valid stipulation relieves the prosecution of the burden of producing any other evidence in order to establish the fact stipulated").

This approach comports with that of other circuits. *See United States v. Smith*, 472 F.3d 752 (10th Cir. 2006) (approving *Branch* and affirming conviction for possessing firearms during drug-trafficking crime where defendant stipulated that weapons were firearms but stipulation was not in evidence); *United States v. Harrison*, 204 F.3d 236 (D.C. Cir. 2000) (approving *Branch* and affirming conviction for felon in possession where defendant stipulated to prior felony and interstate-commerce element but stipulation was not in evidence); *Hardin*, 139 F.3d 813 (11th Cir. 1998) (approving *Branch* and affirming conviction for felon in possession where defendant stipulated to prior felony but stipulation was not in evidence).

Even the Ninth Circuit's decision in *James*, upon which Ayoub relies, can be read as consistent with the view that a conviction can stand where a stipulation on an essential element is never admitted into evidence, so long as the jury is informed of the stipulation. There, the defendant faced federal bank-robbery charges and stipulated that the banks at issue were insured by the Federal Deposit Insurance Corporation—a necessary element of the crime. 987 F.2d at 649. The Ninth Circuit reversed the conviction because "the stipulation was never entered into evidence or read to the jury." *Id.* at 651. Additionally, however, no jury instruction referenced the stipulation or otherwise informed the jury that the government had met its burden to prove the banks were FDIC insured. If there were such an instruction, the jury would have had some basis to make that finding. Other courts have distinguished *James* on this basis. *See, e.g.*, *Smith*, 472 F.3d at 754 (noting that in *James* "the government not only declined to read the defendant's stipulation into evidence, it failed to inform the jury of the stipulation at all"); *Harrison*, 204 F.3d at 241 (noting that the stipulation in *James* "was not mentioned to the jury"). Indeed, even the Ninth Circuit itself, in an

unpublished opinion, explained that "the jury instructions [in *James*] did not inform the jury that the [FDIC] status had been established by stipulation," and that a district court "properly could have informed the jury by means of a jury instruction that the parties had stipulated that [a defendant facing felon-in-possession charges] was a felon." *United States v. Bice*, No. 94-10361, 1995 U.S. App. LEXIS 3628, at *5–6 (9th Cir. Feb. 15, 1995).

Because the stipulations Ayoub entered relieved the Government of its burden to prove the stipulated elements and, as discussed below, the jury had a basis on which to find these elements, Ayoub's rights were not violated.

First, with regard to the prior-felony and interstate-commerce stipulations, Ayoub's jury *was instructed.* (JA 862 ("The defendant and the government have agreed that the defendant was convicted of [a felony] prior to August 11, 2004, so you may take this element of the crime [as] proven beyond a reasonable doubt."); *Id.* ("The defendant and the government have agreed that the firearm in this case had traveled in and affected interstate commerce prior to August 11, 2004, so you may take this element of the crime as proven beyond a reasonable doubt.").) The stipulations relieved the Government of its burden to prove these elements, and the instructions enabled the jury to make these requisite findings. (Additionally, there was uncontroverted evidence regarding Ayoub's prior felony: Agent Howe testified that Ayoub told the officers that "he had a prior felony," and Agent Howe's investigation revealed that Ayoub, "in fact, did have a prior felony." (JA 394–95).)

Second, though there was no instruction regarding Ayoub's stipulation that the substance found was marijuana, sufficient (and uncontroverted) evidence was presented at trial for the jury to so conclude. Agent Howe testified that after he removed the marijuana from the rafters, Ayoub appeared in the backyard, saw the substance in Agent Howe's hands, and said, "The weed is mine." (JA 307, 411–12.) Additionally, the Government entered into evidence Ayoub's written confession, which read as follows: "The pot was mine to smoke. Less than a pound of marijuana, found [by] the police in my dad's garage." (JA 312, 96.) Finally, Officer Cosenza testified that he reviewed the toxicology report, which provided that the substance was a "pound of marijuana." (JA 433.)

In sum, although the stipulations were not put into evidence, the jury could properly find the three elements covered in the stipulations from either jury instructions regarding the stipulations, independent evidence of the elements, or both.

## C.      Evidence of Prior Bad Acts Under Federal Rule of Evidence 404(b)

Ayoub next argues that the district court erred by allowing evidence of prior bad acts, namely, testimony regarding Ayoub's drug-related activity in 2000, which formed the basis of his prior conviction. Officer Michael Kingsbury testified that he participated in four controlled buys of marijuana from Ayoub at his home and then executed a search warrant there on December 19, 2000. Officer Kingsbury testified that the officers participating in the search recovered approximately three pounds of marijuana in gallon-size bags, approximately five grams of cocaine, a triple-beam scale, and a Ruger .45-caliber handgun. Officer Glen Carriveau testified that Ayoub later admitted in writing to buying the marijuana with the intent to sell it.

Rule 404(b) provides in relevant part as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

> knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).

We review the district court's admission or exclusion of evidence for an abuse of discretion. *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) (citing *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001)). In the specific context of Rule 404(b), we employ a three-part test, reviewing (1) for clear error the district court's determination that the "other act" took place; (2) de novo the district court's legal determination that the evidence was admissible for a proper purpose; and (3) for an abuse of discretion the district court's determination that the probative value of the other-acts evidence is not substantially outweighed by its unfairly prejudicial effect. *Id.* (citations omitted). Applying these factors reveals that the district court properly admitted this evidence.

First, Ayoub does not dispute the prior act, i.e., his year-2000 drug activity.

Second, this evidence was admissible for a proper purpose: to show (1) Ayoub's identity as the possessor of the guns and drugs recovered in the present case, and (2) his intent to distribute the drugs. Here, the officers recovered over a pound of marijuana, two firearms, drug paraphernalia, scales, bowls, plastic bags, and cutting agents. The similar evidence in 2000 led Ayoub to confess to possessing the narcotics at that time, and he subsequently pleaded guilty to attempted delivery and manufacture of marijuana. We have repeatedly recognized that prior drug-distribution evidence is admissible to show intent to distribute. *United States v. Jenkins*, 345 F.3d 928, 938 (6th Cir. 2003) (collecting cases). Indeed, Ayoub did not contest at trial that the year-2000 evidence was probative: When the district court stated that Ayoub was contesting "who possessed the marijuana" and whether it was his "intent to distribute it," Ayoub's counsel stated, "as far as probative, we understand that." (JA 176.)

On appeal, however, in an apparent attempt to minimize the probative value of the year-2000 evidence, Ayoub notes that the current evidence against him "was overwhelming, especially given [his] 'full and complete' confession, both orally and in writing." (Ayoub's Br. 30.) He further states that the physical evidence in the present case, such as the packaging materials and mixing agents, showed that he "was not a mere drug user but was actively distributing narcotics." (*Id.*) Moreover, he notes that "the sizeable weight of the marijuana . . . and its secretion in the rafters of the garage . . . strongly indicate the narcotics were intended for distribution." (*Id.* at 30–31.) We agree that this evidence is all quite probative of Ayoub's intent to distribute, but that does not mean the year-2000 evidence was not probative; at best, it means that the year-2000 evidence was not necessary for the conviction. But the question here is simply whether the purpose for which the evidence was offered (i.e., identity and intent) was "in issue," *see Jenkins*, 345 F.3d at 937, and it plainly was.

We sidetrack for a moment to note that Ayoub falls on his own sword here: his argument shows that even if the year-2000 evidence were improperly admitted, any error would be harmless because, as he states, the evidence against him was "overwhelming." *Cf. United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001) ("[T]his Court finds that any error, if any, in admitting evidence of 'other acts' is harmless in light of the overwhelming evidence of Defendant's guilt.") As recounted above, Ayoub explains in detail why the jury properly convicted him of not merely using the drugs but of "actively distributing narcotics." This alone is dispositive of his Rule 404(b) claim.

Returning to the third, and final, step of the Rule 404(b) analysis, the probative value of the year-2000 evidence was not substantially outweighed by its potential prejudicial effect. The district court provided a detailed instruction to the jury that this evidence was offered to establish identity and intent but not "to demonstrate Mr. Ayoub's criminal propensities, or to demonstrate that he is a bad person . . . and [that the jury] must not receive the evidence for those purposes." (JA 480.)

Additionally, as discussed, Ayoub admits the other evidence him was "overwhelming." *Cf. Jenkins*, 345 F.3d at 939 (concluding that prior-acts evidence was unduly prejudicial where "the evidence proffered against [the defendant] by the Government was weak," and "the only real evidence offered by the Government in order to establish her knowledge [of cocaine receipt] came from the contested Rule 404(b) evidence").

In sum, the district court properly admitted the year-2000 evidence under Rule 404(b). Moreover, if any error occurred, it was harmless.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.