**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 12a0235n.06

**No. 08-1426**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 29, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff - Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| RODIA HEARD, | ) | |
| | ) | |
| Defendant - Appellant. | ) | |
| _____ | ) | |

**Before: CLAY, GIBBONS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Rodia Heard was convicted of two counts of mail fraud, 18 U.S.C. § 1341, and one count of conspiracy to commit mail fraud, 18 U.S.C. § 371. In this timely appeal, Heard contends that the admission of certain "other acts" evidence was reversible error. We **AFFIRM**.

**I.**

A.      Factual Background

1.      Heard's Accidents and Employment

On September 22, 1997, Rodia Heard reported to State Farm Insurance Company ("State Farm") that she had been involved in an accident on September 12, 1997, while a passenger in a vehicle driven by Myra Moon, State Farm's insured. Under Michigan's No Fault Motor Vehicle Insurance laws, MCLA §§ 500.3101, *et seq.*, Heard was entitled to collect payment from State Farm

for wages lost as a result of injuries sustained in the accident.  Heard informed State Farm that prior to the accident, she worked at Paradise Chapel Funeral Home ("Paradise Chapel").

To verify Heard's employment, State Farm sent a Wage and Salary Verification ("WSV") form to Paradise Chapel, which State Farm received back on March 12, 1998.  The WSV form was signed by Harold Williams, the funeral director of Paradise Chapel, and stated that Heard had been employed at Paradise Chapel from March 1997 through November 1997; that she worked sixty hours per week and averaged fifteen overtime hours; and that her salary was $500 per week.  Based on these representations, State Farm paid Heard wage-loss benefits covering the period from September 1997 until September 11, 2000, the three-year maximum allowed under Michigan's no fault law.  In total, State Farm paid Heard $58,566.11 for lost wages arising out of Heard's first automobile accident.

On December 8, 2000, approximately three months after Heard's wage-loss payments from her first accident ended, Heard contacted State Farm to report that she had been a passenger in a second automobile accident.  This time, the insured driver was Irene Heard, Rodia Heard's mother.  Heard informed State Farm that she had returned to work at Paradise Chapel on October 28, 2000.  State Farm received a second completed WSV form from Paradise Chapel stating that Heard was the Director's Assistant from October 28, 2000 through December 7, 2000, and that Heard worked approximately 54 hours per week earning a weekly salary of $700.  Paradise Chapel also returned a WSV form for Heard's mother, who was also claiming wage-loss benefits, stating that she was a grief counselor at Paradise Chapel working 48 hours per week at a weekly salary of $550.  Heard and her mother both received wage-loss benefits based on the employment information contained in the WSV forms submitted by Paradise Chapel.  In total, State Farm paid approximately $20,100 to Irene

2

Heard and $59,001 to Rodia Heard in wage-loss payments over the course of almost two years for the second accident.

## 2. Heard's Alleged Fraud

Perceiving problems, State Farm began to seek more detailed employment information from Heard. First, State Farm requested a copy of one of Heard's check stubs. The check stub Heard presented covered a one-week pay period from November 27, 2000 to December 4, 2000 and indicated that Heard worked for forty hours that week and reflected federal tax, FICA, and Social Security withholdings. State Farm requested Heard's employment records from Paradise Chapel, but Heard said the employment records had been destroyed.

State Farm also requested tax records for Heard's mother. Heard's mother's tax information for 2000 made no mention of Paradise Chapel, but stated that her employer was the Payne-Pulliam School of Trade and Commerce ("Payne-Pulliam"). Consequently, State Farm requested employment information from Payne-Pulliam, which showed that Heard's mother had been employed full-time at Payne-Pulliam for the entire year of 2001, the same period Heard's mother had represented to State Farm that she was unable to work.

Additionally, State Farm routinely requests persons who have received wage-loss benefits for an extended period to inquire whether they may be entitled to Social Security Disability Insurance ("SSDI") benefits. Heard informed State Farm that a Social Security Administration ("SSA") representative told her that she did not have enough accumulated credits to qualify for SSDI benefits, but that she might qualify based on an eye injury she received during her childhood. State Farm requested records from the SSA, which revealed that Heard had no work history post-1979 and that

3

Heard had been receiving SSDI benefits during the period for which she claimed wage-loss benefits from State Farm. In December of 2002, State Farm ceased making wage-loss payments to Heard.

3.      Heard's Trial

In June 2006, the government charged Heard with committing mail fraud by submitting fraudulent wage-loss claims to State Farm. The key issue at trial was whether the employment information submitted to State Farm was fraudulent. At trial, the government called three witnesses who worked at Paradise Chapel during the same period Heard claimed she worked there: Jerry Lee Calloway, Russia Brundidge, and Harold Williams. Calloway, a part-time employee, testified that he saw Heard three times during the four years he worked at Paradise Chapel and that he did not know Heard's mother. Williams, the Funeral Director, also testified that Heard was not employed at Paradise Chapel and that he did not know Heard's mother. Williams, whose signature was on both WSV forms, testified that he did not sign any form submitted to State Farm.

The most damaging testimony for Heard's defense was that of Russia Brundidge, the owner of Paradise Chapel. Brundidge, a co-conspirator cooperating with the government, testified that Heard contacted him after her first accident and asked if Brundidge would fabricate employment information to provide to State Farm; he agreed. Brundidge explained that neither Heard nor Heard's mother had ever been employees of Paradise Chapel. He told the jury that none of the information included on the WSV forms was true; that the signatures on the WSV forms were forged; that Heard had never worked at Paradise Chapel for the number of hours per week she claimed; and that he had never paid Heard a weekly salary. On five to seven occasions, Brundidge asked Heard to answer phones when no one else was available, but Brundidge never paid Heard for her help in this regard. Brundidge clarified that he would pay Heard a modest fee – around $100 –

4

for referring funerals to Paradise Chapel and that Heard would help bring the families out of the chapel at the conclusion of the service. Brundidge guessed that he had paid Heard a referral fee for approximately ten funerals.

4. "Other Acts" Witnesses

The government called six additional witnesses to testify about information that Heard had provided to various companies on credit and loan applications.[1] None of the witnesses had a connection to the alleged State Farm fraud. The witnesses testified that Heard submitted applications to their companies stating she was employed, but these applications directly contradicted the representations Heard made to State Farm. These witnesses also testified that based on these representations, Heard reaped certain benefits, such as loans and credit.

The first such witness was Deborah Baker, an employee of Chase Home Finance, who testified that Heard applied for a $41,000 loan and that in the loan application, dated March 30, 1998, Heard stated she had been working at a company called "Future Projections" for six years. As proof of employment, Heard submitted check-stubs that reflected federal tax and SSA withholdings.

Next, the government called Rick Bentz, a Citibank representative, who testified that Heard applied for a credit card in June 2002. On the application, Heard stated she had worked for Paradise Chapel since 1994. Bentz testified that $5,111 in charges was never repaid to Citibank.

The third witness was SSA representative Aaron Poyer, who testified that Heard had received SSDI payments since 1975; that a person typically cannot receive SSDI benefits while employed;

---

[1]The government also called an FBI agent to provide a summary of the contradictory information that Heard provided to the various entities, as well as an employee of Payne-Pulliam who testified that Heard's mother was employed at Payne-Pulliam full-time during the time she was receiving wage-loss payments. The government called a handwriting analysis expert as well.

and that the SSA never received notification that Heard was employed during the periods she told State Farm she was employed with Paradise Chapel.[2]

The government then called Charollet Cooley, a credit supervisor at Dittrich Furs and Company ("Dittrich"), who provided evidence that in a credit application Heard submitted to Dittrich on January 6, 2001, Heard stated that she was the Director's Assistant at Paradise Chapel. The government elicited further testimony that Heard purchased several mink items and left an outstanding balance of over $10,000.

Bradley Chartier, a representative of TCF National Bank ("TCF"), testified regarding three TCF loans to Heard from June 2000 to March 2001, totaling approximately $94,000. In applying for these loans, Heard submitted paystubs indicating she was employed at Paradise Chapel during the same time for which she collected wage-loss benefits from State Farm. Chartier testified that all three TCF loans were paid in full. Finally, the government called Bruce Siddall to testify about four loans Standard Federal Bank made to Heard from October 2001 to April 2002, totaling $205,000. Heard's application for the loans indicated that she had been employed by Paradise Chapel for the past seven years, earning a salary of $6,200 per month. Siddall testified that Heard defaulted on three of the four loans, leaving Standard Federal with a loss of approximately $39,000.

B.      Procedural Background

---

[2]When the government began to elicit this testimony from the SSA representative, Heard's counsel objected and asked the Court for a limiting instruction. The court granted the request and explained that "[Heard] is not charged with Social Security fraud. That is not the purpose of bringing this in."

On June 6, 2006, the government filed a First Superceding Indictment against Rodia Heard, alleging two counts of mail fraud and one count of conspiracy to commit mail fraud.[3] Heard filed a motion in limine, arguing that certain witnesses' testimony would be used for the improper purpose of introducing evidence of "other acts" in violation of Federal Rule of Evidence ("FRE") 404(b). After hearing argument, the court deferred ruling on Heard's motion until trial.

The trial began on September 17, 2007, and lasted four days. During its opening statement, the government referred to Heard "reap[ing] furs from an upscale fur store that [Heard] never paid on." Heard's counsel immediately objected on the basis that the evidence of similar acts would run afoul of Rule 404(b).[4] The government argued that the evidence was not Rule 404(b) evidence and was instead impeachment evidence; in the alternative, the government said the evidence was probative of a common scheme, a permissible 404(b) purpose. The district court overruled Heard's objection because the testimony related to a "common scheme." Throughout the trial, Heard's counsel objected – framed as a "continuing objection" – when one of the so-called "other acts" witnesses first took the stand.

The district court provided the following limiting instruction, which allowed the jury to use the other acts evidence to show Heard's knowledge or plan:

> You have heard testimony that the defendant committed acts other
> than the ones charged in the indictment. If you find the defendant did

---

[3]The Indictment also named Irene Heard and Dr. Zack Brown as defendants. Irene Heard passed away and was consequently dismissed. Brown was found guilty in a different case, and as a result, the government also dismissed him.

[4]Defense counsel in fact moved for a mistrial on the theory that in the motion in limine hearing, the government stated that it intended to call the questionable witnesses to show that Heard's actions were "[in]consistent with what she did in this particular case." The district court denied Heard's motion.

those acts, you can consider the evidence only as it relates to the government's claim on the defendant's plan and knowledge. You must, it will be not, [*sic*] you must not consider it for any other purpose. Remember that the defendant is on trial here only for conspiracy to commit mail fraud and mail fraud, not for the other acts. Do not return a guilty verdict unless the government proves the crime charged in the indictment beyond a reasonable doubt.

The jury convicted Heard on all counts, and the district court sentenced Heard to thirty-seven months' imprisonment, two years of supervised release, and restitution. Heard timely appealed.

**II.**

We generally review a district court's admission or exclusion of evidence for abuse of discretion. *See United States v. Perry*, 438 F.3d 642, 647 (6th Cir. 2006). In the 404(b) context, however, some cases in this circuit have continued to employ a three-tiered standard of review. *Compare United States v. Ayoub*, 498 F.3d 532, 547 (6th Cir. 2007) (employing three-tiered standard of review) *with United States v. Haywood*, 280 F.3d 715, 719-20 (6th Cir. 2002) (rejecting three-tiered standard of review). We agree with the court in *United States v. Allen*, and review the district court's ruling for abuse of discretion. 619 F.3d 518, 523, 524 n.2 (6th Cir. 2010) (reviewing 404(b) decision for abuse of discretion and noting that *Haywood* repudiated three-tiered standard of review).

Federal Rule of Evidence 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident..

Fed. R. Evid. 404(b).[5] This court has outlined a tripartite test in the specific context of Rule 404(b). When considering whether to admit evidence of "other acts," the district court must:

---

[5]Rule 404 was amended in December 2011, but the changes were stylistic only.

(1) make a preliminary finding as to whether sufficient evidence exists that the prior act occurred; (2) determine whether the other act is admissible for one of the proper purposes outlined in Rule 404(b); and (3) apply Rule 403 balancing to determine whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice or the other concerns embodied in Rule 403.

*Allen*, 619 F.3d at 523. The 404(b) list of exceptions is "illustrative" rather than "exclusive," *United States v. Foster*, 376 F.3d 577, 591 (6th Cir. 2004) (citation omitted), and the rule is "actually a rule of inclusion rather than exclusion, since only one use is forbidden and several permissible uses of such evidence are identified." *United States v. Carney*, 387 F.3d 436, 450 n.11 (6th Cir. 2004) (citation and quotation marks omitted).

## III.

The dispute here centers on the second and third prongs of the Rule 404(b) inquiry – that is, did the government introduce the evidence for a "proper purpose" and was the evidence unduly prejudicial when compared with its probative value. Heard contends that the district court's decision to allow the evidence runs afoul of both prongs. The testimony that the "other acts" witnesses provided does not fit neatly into a single category. Some of the testimony relates to Heard's employment representations made on credit and loan applications, while other testimony involves Heard's defaults on her debt obligations and certain purchases she made on credit. We analyze the two categories separately.

### A.    Heard's Employment Representations

The government offered six witnesses to show that Heard made representations to State Farm about her employment that were completely contradictory to representations made to these other companies and the SSA. For example, Bradley Chartier, an employee of TCF, testified that Heard

submitted a loan application indicating she was employed with Paradise Chapel during the period of 1995-2000. Heard represented to State Farm, however, that during this same period she was unable to work, and received wage-loss benefits from State Farm based on this representation. Each of the other acts witnesses provided similar testimony.

We first determine whether testimony regarding Heard's contradictory employment representations was admitted for a purpose other than demonstrating Heard's propensity to commit fraud. Evidence is admitted for a proper purpose if it is "probative of a material issue other than character." *Carney*, 387 F.3d at 451 (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). Heard was charged with conspiracy to commit mail fraud and mail fraud. The mail fraud statute places Heard's knowledge and intent in issue. 18 U.S.C. §1341; *see also United States v. Martinez*, 588 F.3d 301, 316 (6th Cir. 2009) (explaining requirements of mail fraud statute); *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 488 (6th Cir. 1999).

The proffered testimony – which goes to whether Heard knew that her employment representations to State Farm were false and the intent with which she made the representations – is therefore probative of a material issue: Heard's knowledge and intent. *See United States v. Merriweather,* 78 F.3d 1070, 1076 (6th Cir. 1996). The portions of the witnesses' testimony related to contradictory employment information provided by Heard were admitted for a purpose other than showing Heard's propensity to commit fraud. It was therefore not error to admit those portions of the testimony. Heard's counsel effectively conceded as much at oral argument.

If the testimony is otherwise admissible under 404(b), the district court must still determine whether the probative value of the testimony is substantially outweighed by any prejudicial effect, in accordance with FRE 403. *See United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000) (citation

and quotation marks omitted). We consider four factors when making this determination: (1) whether other acts evidence is unduly prejudicial; (2) if other means of proof are available; (3) when the other acts occurred; and (4) whether the district court gave a limiting instruction.[6] *United States v. Brown*, 147 F.3d 477, 483 (6th Cir. 1998) (citation omitted).

Here, any prejudicial effect of the testimony concerning Heard's employment representations does not outweigh its probative value. The evidence that Heard misrepresented her employment to the various credit and loan companies is no more inflammatory than evidence that she lied to State Farm and is therefore not unduly prejudicial. *See generally Brown*, 147 F.3d at 483-84 (explaining that evidence of similar telemarketing calls by defendant was not unfairly prejudicial because they were "just additional calls"); *see also United States v. Myers*, 123 F.3d 350, 363 (6th Cir. 1997) (explaining that evidence of additional drug sales not prejudicial because they were "just other sales"). Although the availability of other means of proving the government's case may, in fact, support Heard's argument, the district court gave a limiting instruction and reminded the jury that Heard was only on trial for the acts charged.[7] *Cf. United States v. Jenkins*, 593 F.3d 480, 485-86 (6th

---

[6]This court has previously explained that, although "it is preferable that the district court make explicit findings regarding the Rule 403 balancing," *United States v. Stevens*, 303 F.3d 711, 717 (6th Cir. 2002) (citation and quotation marks omitted), which the district court failed to do presently, this failure is not automatically reversible error. *See United States v. Acosta-Cazares*, 878 F.2d 945, 950-51 (6th Cir.), *cert. denied*, 493 U.S. 899 (1989).

[7]Although Heard challenges the district court's jury instruction by insisting that no instruction would have cured the prejudice, Heard's counsel did not object to the district court's instruction, which means we review it for plain error. *See United States v. Olano*, 507 U.S. 725, 731 (1993). The defendant has not demonstrated that the district court's instruction "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 732; *see also (Joyce) Johnson v. United States*, 520 U.S. 461, 466-67 (1997).

11

Cir. 2010) (reversing when evidence amounted to "piling on"). Heard also concedes that the timing of the other acts does not support her argument.

Here, viewing the evidence in the light most favorable to the government, *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (citation and quotation marks omitted), any potential prejudicial effect of testimony about Heard's employment representations on various credit and loan applications does not substantially outweigh its probative value. The district court did not commit reversible error in admitting this evidence.

### 2.        Heard's Defaults and Fur Purchases

This leaves the testimony that Heard did not fully pay her credit card debt to Citibank, that Heard did not fully pay her mortgage debt to Standard Federal Bank, and that Heard did not fully pay Dittrich for the furs, as well as testimony regarding the number and type of furs she purchased. The record does not assist our review. The district court never engaged in a detailed analysis of the specific testimony we now discuss. The district court's failure to engage in a particularized analysis, while troubling, is the result of the way Heard's trial counsel framed these issues; he made only a blanket objection to the testimony of the witnesses at the outset of the trial and again when the witnesses first took the stand. He did not object when the government elicited the *specific* testimony. In fact, in the one instance when Heard's trial counsel *did* make such a specific objection, the district court sustained it.[8]

For the remainder of the questionable testimony, however, Heard's counsel made no precise objection. Heard's counsel remained silent as the government elicited testimony that Heard left a

---

[8]When the government sought to elicit testimony from Bentz, the Citibank representative, about the kinds of purchases that Heard made on her credit card, such as airline tickets, the district court properly sustained Heard's objection.

balance outstanding on the credit card of approximately $5,000. The government elicited testimony from Cooley about the number of furs that Heard purchased, the specific kinds of furs, and whether Heard fully paid Dittrich for the furs. Again, Heard's counsel did not object. When the government inquired into the amount of the loans that Standard Federal made to Heard and whether she paid back the loans, Heard's counsel, once again, was silent. There was never the kind of precise, penetrating analysis that Rule 404(b) demands.

In any event, we are satisfied that any error in admitting this testimony was harmless. In making the determination whether an error is harmless, this court "must take account of what the error meant to [the jury], not singled out and standing alone, but in relation to all else that happened." *United States v. Cowart*, 90 F.3d 154, 158 (6th Cir. 1996) (citation and quotations marks omitted). We do not require reversal based on erroneously admitted evidence unless we can say "with *fair assurance* . . . that the judgment was *substantially* swayed by the error," *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001) (emphasis added), which "generally depends on whether the properly admissible evidence of the defendant's guilt was overwhelming." *Haywood*, 280 F.3d at 724; *see also Murphy*, 241 F.3d at 453 (citation omitted).

The testimony to which Heard objects – that Heard defaulted on her credit obligations, the amount of the defaults, and the presentation of the various mink items – formed only a small portion of the testimony the six witnesses offered. The amount of Heard's defaults and the number of mink coats notwithstanding, the government presented more than ample evidence of Heard's guilt. The testimony of the Paradise Chapel employees, coupled with the contradictory information Heard provided to the other companies, reveals overwhelmingly that Heard knew the employment

13

information she submitted to State Farm was demonstrably untrue. Any error was therefore harmless.

**IV.**

For the foregoing reasons, we **AFFIRM** the decision of the district court.