RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ROCKWOOD AUTO PARTS, INC.; ROCKWOOD TOWING, INC.; JACQUES POLI aka Jack Poli,

> *Plaintiffs-Appellants,*

*v.*

MONROE COUNTY, MICHIGAN; TROY GOODNOUGH; MICHAEL PREADMORE; JEFFREY KEMP,

> *Defendants-Appellees.*

No. 24-1828

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:22-cv-10649—Shalina D. Kumar, District Judge.

Argued: July 30, 2025

Decided and Filed: September 10, 2025

Before: MOORE, GRIFFIN, and RITZ, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellants. Heather E. Sumner, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Lansing, Michigan, for Appellees. **ON BRIEF:** Raechel M. Badalamenti, KIRK, HUTH, LANGE & BADALAMENTI, PLC, Clinton Township, Michigan, for Appellants. Heather E. Sumner, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER, PC, Lansing, Michigan, for Appellees.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   For several years, Rockwood Auto Parts, Inc., and Rockwood Towing, Inc., worked closely with the Monroe County Sheriff's Office and former Sheriff Dale Malone.  Rockwood Auto performed regular maintenance on the sheriff's fleet of patrol cars.  And Rockwood Towing held a plum position on the sheriff's call list when a civilian or a deputy got into a wreck.  Then a new sheriff came to town.  Shortly after Troy Goodnough became sheriff, Monroe County bid out the fleet-maintenance work and awarded the contract to a different shop.  Goodnough also revised the towing list, reducing Rockwood's share of the county's tow calls.  All of this has been bad for business at Rockwood Auto and Rockwood Towing.  So, the companies and their owner, Jacques ("Jack") Poli, sued Goodnough, Monroe County, and Sergeant Michael Preadmore, alleging violations of their constitutional rights.  The district court granted summary judgment to Defendants.  For the following reasons, we AFFIRM.

**I. BACKGROUND**

In November 2020, voters in Monroe County, Michigan, elected a new sheriff.  Troy Goodnough, who previously managed the Monroe County jail, was selected to take over from Dale Malone, who had held the position since 2013.  *See* R. 52-7 (Goodnough Dep. at 9) (Page ID #1525); Monroe Cnty. Br. at 2.  Goodnough had different ideas about how to do the job.

After taking office in January 2021, Goodnough began looking into how the Sheriff's Office was managing its property.  R. 52-7 (Goodnough Dep. at 98–101) (Page ID #1548). During the prior administration, Rockwood Auto performed routine maintenance on Sheriff's Office vehicles, and Goodnough believed that Rockwood Auto/Rockwood Towing was in possession of certain cars and a boat trailer owned by the Sheriff's Office.  *Id.* at 100, 104, 115–16 (Page ID #1548–49, 1552).  On January 19, Goodnough went with Sergeant Michael Preadmore to the location of Rockwood Towing and Rockwood Auto ("Rockwood").  Upon arrival, the officers met the owner's son, Anthony Poli, the sole employee of Rockwood Auto

and the only person on site at the time. R. 52-10 (A. Poli Dep. at 9, 27) (Page ID #1681, 1685). Goodnough announced that he needed to audit Sheriff's Office property held there. *Id.* at 29 (Page ID #1686); R. 52-7 (Goodnough Dep. at 116, 124) (Page ID #1552, 1554). Anthony allowed the officers in. R. 52-10 (A. Poli Dep. at 29) (Page ID #1686).

As Goodnough walked through the facility, he noticed a parking lot containing several Crown Victoria patrol cars with Sheriff's Office markings and emergency equipment still attached. R. 52-7 (Goodnough Dep. at 116) (Page ID #1552). Anthony said that Rockwood purchased the cars at auction. *Id.* Goodnough found it odd that the Sheriff's Office would have sold cars with the emergency equipment still attached, so he inspected the cars and asked Preadmore to take down their VIN numbers. *Id.* at 116–17 (Page ID #1552).

During the search, Goodnough asked Anthony if he knew where to find a boat trailer owned by the Sheriff's Office but apparently stored at Rockwood. *Id.* at 125–26 (Page ID #1554–55). At this point, Anthony said that he needed to call his father, Jack. *Id.* at 128 (Page ID #1555). After speaking with Jack, Anthony indicated that the boat trailer was located at his father's home. *Id.* at 128–29 (Page ID #1555); *see* R. 52-10 (A. Poli Dep. at 46–48) (Page ID #1690). Goodnough and Preadmore headed over there and planned to meet with Jack. R. 52-7 (Goodnough Dep. at 129–30) (Page ID #1555–56). After waiting a while, Preadmore called Jack to see when he was coming home. *Id.* at 130 (Page ID #1556). Jack said he was in Detroit and could not meet them that day. *Id.* at 131 (Page ID #1556). Jack was confrontational with Goodnough and demanded to know whether he was being investigated. R. 52-2 (J. Poli Dep. at 117) (Page ID #1389). Goodnough repeatedly "insisted . . . that it was just an audit." *Id.*

The next morning, Goodnough and Preadmore returned to meet Jack outside a pole barn at Jack's residence. R. 52-7 (Goodnough Dep. at 131) (Page ID #1556). Jack opened the door and let them in. R. 52-2 (J. Poli Dep. at 75) (Page ID #1378). Inside the pole barn, Goodnough noticed the trailer laden with a Stingray boat, which the Sheriff's Office sold as scrap a few years earlier. R. 52-7 (Goodnough Dep. at 132) (Page ID #1556). Goodnough was surprised by the boat's apparently good condition; it was "polished" and "in pristine condition," and Jack remarked that he had "just put a fish finder on it." *Id.* at 133 (Page ID #1556).

After the searches of Rockwood and Jack's pole barn, Goodnough contacted the state sheriffs' association to see what, if anything, he should do to investigate further the Crown Victoria patrol cars located on Rockwood's north lot, the Sheriff's Office boat trailer with a private boat on it, and the Stingray boat that was sold as scrap but appeared to be in good condition. R. 52-7 (Goodnough Dep. at 156–58) (Page ID #1562–63). The director of the sheriffs' association advised Goodnough to contact Michigan State Police to investigate whether this was criminal activity, or just poor recordkeeping. *Id.* at 158 (Page ID #1563). Michigan State Police commenced an investigation into whether there was "money missing from the sale of two County owned boats," including the Stingray. R. 42-17 (MSP Rep. at 1) (Page ID #1004). The investigation revealed that the Stingray boat was sold as salvage to Jack's niece for $1,200, and that she sold the boat to Jack. *Id.* at 12 (Page ID #1014). The investigation did not probe the transfer of the Crown Victoria cars located at Rockwood. *See id.* at 14 (Page ID #1016). The Michigan Attorney General declined to bring charges against Jack.[1]

Around the time of the searches, Goodnough asked Michael Bosanac, Monroe County's chief financial officer, to draft a request for proposal ("RFP") for maintenance of the Sheriff's Office's vehicle fleet. R. 52-7 (Goodnough Dep. at 210–11) (Page ID #1576). Rockwood Auto was performing the work without a contract, and the work had not been subject to a competitive bidding process. *Id.* at 211 (Page ID #1576); *see* R. 52-2 (J. Poli Dep. at 33) (Page ID #1368). Issued on February 4, 2021, the RFP sought bids "for professional services to provide vehicle maintenance for [the] Monroe County Sheriff's Office fleet including marked and unmarked vehicles." R. 42-9 (RFP at 1) (Page ID #910). Bidders were asked to submit information regarding their "qualifications to perform the required services" and the cost to provide those services, including oil changes and replacement of air filters, brake pads, catalytic converters, and water pumps. *Id.* at 1, 5 (Page ID #910, 914). Monroe County advised that proposals would

---

[1]The investigation revealed evidence that former Undersheriff Jeff Kemp sold Monroe County property to family members and Sheriff's Office contractors below their value. *See* R. 42-17 (MSP Rep. at 9–11) (Page ID #1011–13) (documenting the sale of a boat, without proof of payment, to the owner of another auto-repair shop conducting business for the Sheriff's Office); *id.* at 17–20 (Page ID #1019–22) (documenting the sale of vehicles, including Crown Victoria patrol cars, to Rockwood Auto and Kemp's family members, without full consideration). However, the Attorney General declined to bring charges against Kemp or others. *Id.* at 39 (Page ID #1041). Kemp was charged with larceny and misconduct in office after a separate investigation. *Id.*

be evaluated and scored, and the County would seek any "clarification of proposals" and conduct any "final negotiations with the finalist firm(s)" before awarding the contract. *Id.* at 1–2 (Page ID #910–11). The County reserved "the right to accept or to reject any and all proposals, to waive any irregularities and to make an award that is determined by the County of Monroe to be in the best interest of the County." *Id.* at 2 (Page ID #911).

Three vendors submitted bids: Monroe Dodge, Gerweck Nissan, and Rockwood Auto. R. 42-10 (Bids) (Page ID #923–30). Monroe Dodge was quickly eliminated because it quoted services on only Dodge vehicles, and the Sheriff's Office fleet consisted mainly of Ford Explorers. R. 52-7 (Goodnough Dep. at 217) (Page ID #1577). As to Gerweck Nissan, Goodnough noticed that the bid had "a lot of vague information," so he obtained Bosanac's authorization to seek "clarification." *Id.* at 216 (Page ID #1577). Goodnough called Gerweck Nissan and spoke to the service manager regarding the quoted prices. *Id.* at 222 (Page ID #1579). This conversation resulted in a revised bid, which contained more precise costs for the various services (most of which were higher than the initial quote). *See* R. 52-13 (Gerweck Clarified Bid) (Page ID #1735). Goodnough did not call Rockwood Auto to discuss its bid. R. 52-7 (Goodnough Dep. at 233) (Page ID #1581). Bosanac awarded the contract to Gerweck Nissan. *Id.* at 239 (Page ID #1583); R. 52-4 (Bosanac Dep. at 79–80) (Page ID #1446). According to Monroe County, awarding the bid to Gerweck Nissan was appropriate because it was lower than Rockwood Auto's bid. Monroe Cnty. Br. at 15. Rockwood Auto asserts that the bids are like apples and oranges and that Gerweck Nissan won the contract because its owner is a longtime friend of Goodnough's brother and contributed to Goodnough's campaign for sheriff. Rockwood Br. at 15 & n.1, 51–52.[2]

---

[2]Ultimately, Gerweck Nissan proved unable to keep up with the flow of work from the Sheriff's Office, and there were issues with billing the contracted-for amounts. *See* R. 52-11 (Gerweck Dep. at 27) (Page ID #1715); R. 52-7 (Goodnough Dep. at 244, 248) (Page ID #1584–85). Because of this, the Sheriff's Office began directing fleet-maintenance work to a handful of other auto-repair shops but did not return to Rockwood Auto. R. 52-7 (Goodnough Dep. at 249–53) (Page ID #1585–86); R. 52-18 (Gurganus Dep. at 35–36) (Page ID #1775). In 2022, Monroe County rebid the fleet-maintenance work and awarded it to other auto-repair shops. R. 52-7 (Goodnough Dep. at 253) (Page ID #1586).

During the year after his election, Goodnough also made changes to the Sheriff's Office's non-preference tow list, a list of towing companies called in a rotation when a car breaks down in Monroe County. R. 52-7 (Goodnough Dep. at 180) (Page ID #1568). Monroe County has historically been split into eight towing areas. *Id.* at 175 (Page ID #1567). In short, before Goodnough was elected as sheriff, Rockwood Towing had exclusive responsibility for one towing area and shared responsibility for two others. In January 2022, Goodnough removed Rockwood Towing from one area and added another towing company to its exclusive areas. These changes have reduced Rockwood Towing's share of Monroe County's towing business.

A summary of towing responsibilities, as relevant to this litigation, is below.

|  | **3/19/2020** | **9/14/2021** | **1/24/2022** |
|---|---|---|---|
| **Area Four** | Jim's Towing, Star Towing, Duffy's Towing, A1 Towing, **Rockwood Towing** | Jim's Towing, Star Towing, Duffy's Towing, A1 Towing, **Rockwood Towing** | Jim's Towing, Star Towing, "Duffey Towing," A1 Towing |
| **Area Five** | **Rockwood Towing** | **Rockwood Towing** | **Rockwood Towing**, Star Towing, Jim's Towing |
| **Area Six** | **Rockwood Towing**, Star Towing | **Rockwood Towing** | **Rockwood Towing**, Star Towing |
| **Area Seven** | Larocca's Towing, Owen's Auto Parts | "Owens Towing" | Larocca's Towing, Owen's Auto Parts |

R. 42-13 (Pre-2021 Tow List) (Page ID #962); R. 52-19 (9/24/21 Tow List) (Page ID #1782); R. 52-22 (1/24/22 Tow List) (Page ID #1798).

In March 2022, Rockwood Auto, Rockwood Towing, and Jack ("Plaintiffs") filed a lawsuit against Monroe County, Goodnough, and Preadmore ("Defendants") in the U.S. District

Court for the Eastern District of Michigan.  The suit alleged constitutional violations pursuant to 28 U.S.C. § 1983.  First, the lawsuit claimed that Goodnough and Preadmore violated Plaintiffs' Fourth Amendment right to be free from unlawful searches by conducting the audit at Rockwood and Jack's pole barn.  R. 1 (Compl. ¶¶ 65–99) (Page ID #65–20) (Count One).  Second, the lawsuit claimed that Defendants violated Plaintiffs' Fourteenth Amendment equal-protection rights by awarding the fleet-maintenance contract to Gerweck Nissan and reducing Rockwood Towing's share of the tow list for no rational reason and out of personal animus against Jack.  *Id.* ¶¶ 100–111 (Page ID #20–22) (Count Two).  Third, the lawsuit claimed that Defendants violated Plaintiffs' due-process rights under the Fifth and Fourteenth Amendments by arbitrarily awarding the fleet-maintenance contract to Gerweck Nissan.  *Id.* ¶¶ 112–20 (Page ID #22–23) (Count Three).  Finally, the lawsuit sought to impose municipal liability on Monroe County under whose policies and customs the prior violations took place.  *Id.* ¶¶ 121–31 (Page ID #24–26).  The suit sought a declaratory judgment, damages, and attorney's fees.  *Id.* ¶¶ A–H (Page ID #26).

After discovery, Defendants moved for summary judgment, which the district court granted on all the claims.  R. 67 (Order at 31) (Page ID #2088).  Plaintiffs timely appealed.  We have jurisdiction to review that decision pursuant to 28 U.S.C. §§ 1331 and 1291.

## II.  STANDARD OF REVIEW

Faced with a motion for summary judgment, the job of a district judge is to determine if there is a "need for a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The question is whether the evidence in the record is "so one-sided" that a jury could rightly find for the moving party only, or whether there is enough countervailing evidence on at least one material question that a jury would be justified in finding for the non-moving party.  *Id.* at 251–52.

At summary judgment, the initial burden falls on the moving party to establish the lack of any genuine dispute of material fact, which the moving party may do by pointing out the lack of evidence to support an "essential element of [the non-moving party's] case." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (citation omitted).  The burden then shifts to the non-moving

party to produce "significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Id.* (citation modified). Because fact-finding is the province of the jury, the judge must view the factual record in the light most favorable to the non-moving party. *See Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 772 (6th Cir. 2025). The district judge should not make credibility determinations or weigh the evidence for herself: "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. If the evidence is sufficient to permit a jury to "reasonably find for either the plaintiff or the defendant," the case must be sent to trial. *Id.* But if the moving party can "show[] that there is no genuine dispute as to any material fact," then "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the grant of summary judgment de novo. *Kean*, 140 F.4th at 772.

## III.  FOURTH AMENDMENT SEARCH

The warrantless search of a home or a business presumptively violates the Fourth Amendment. *City of Los Angeles v. Patel*, 576 U.S. 409, 419–20 (2015). This presumption can be overcome by evidence of consent. Searches undertaken with valid consent do not violate the Fourth Amendment even when they are conducted without a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006). Because a warrantless search is presumptively invalid, the burden to demonstrate valid consent rests with the officer who conducted the search. *Harris v. Klare*, 902 F.3d 630, 638–39 (6th Cir. 2018). To demonstrate valid consent, an officer must show that consent to search was "freely and voluntarily given" by a person with authority to consent. *Schneckloth*, 412 U.S. at 222; *see Morgan*, 435 F.3d at 663. "[T]he scope of the consent given determines the permissible scope of the search." *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (quoting *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997)).

The parties agree that the audits at Rockwood and Jack's pole barn were warrantless searches under the Fourth Amendment. Plaintiffs challenge the validity of Anthony's consent to those searches. They argue that (1) Anthony lacked authority to consent to the search of Rockwood; (2) the search of Rockwood exceeded the scope of any consent; and (3) the searches were pretextual.

## A.  Authority

We begin with Anthony's authority to consent to the search of Rockwood.  We have recognized that consent can be provided by any person with *actual* or *apparent* authority over the premises.  *See Morgan*, 435 F.3d at 663.  Persons with actual authority generally include the property owner and their authorized agents, as well as any "third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir. 2007) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).  But "even where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through [their] consent." *Morgan*, 435 F.3d at 663.  Apparent authority is determined objectively. *Ayoub*, 498 F.3d at 537.

Defendants argue that Anthony had actual authority to consent to the search of Rockwood.  Because Anthony is not the owner of the business, and Plaintiffs contest his authority to consent to the search, we ask whether Anthony had "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171.  Defendants have met their burden of showing that he did.  Anthony is the adult son of Jack and the only employee of Rockwood Auto. *See* R. 52-10 (A. Poli Dep. at 9, 27) (Page ID #1681, 1685).  Although Anthony lacks an official title there, he is responsible for managing Rockwood Auto's email, preparing its tax records, submitting its bids for RFPs, and serving as a corporate representative in this litigation. *Id.* at 10–15, 72, 82, 95 (Page ID #1681–82, 1696, 1699, 1702).

Our prior cases considering actual authority in the context of home searches supports the conclusion that a person with such a relationship to the business has actual authority to consent to the search of its premises.  In *Ayoub*, for example, we upheld a district court's determination that an adult daughter had actual authority to consent to the search of her parents' house while they were out of town.  498 F.3d at 539.  The fact that she was both the daughter of the homeowners and the long-term caretaker of the house in her parents' absence led us to conclude that she had actual authority to consent. *Id.*  Much like the adult daughter in *Ayoub*, not only was Anthony the adult child of Jack, but also Anthony oversaw the operation while Jack was gone.

Anthony therefore had "greater authority than a typical employee as the [son] of the [businessowner] who w[as] not occupying the premises at the time, regardless of [Anthony's ownership] interest the [business]." *Id.*

By contrast, in *United States v. Jones*, we determined that a handyman could not consent to a search of a home. 335 F.3d 527, 531 (6th Cir. 2003). In *Jones*, law-enforcement officers sought to search the home of an arrestee who refused to consent. *Id.* at 529. Nonetheless, the officers went to his house without a warrant and knocked on the door. *Id.* The man who opened the door advised that "he was there to clean up the house" and allowed the officers inside, where they found unlawful weapons. *Id.* at 529–30. We held that this man lacked actual authority to legally consent to the search because he was merely a handyman, and the homeowner previously denied consent to the search. *Id.* at 531. But Anthony, unlike the handyman in *Jones*, was a longtime employee—having worked for his father for a decade—not a casual worker. And he had a significant role in managing the business's operations. Finally, nothing suggests that Jack objected to the search of Rockwood. *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 8.6(c) (6th ed. 2024)).

Plaintiffs object that Defendants rely improperly on information learned in discovery about Anthony's role in the business, which may have been unknown to the officers at the time of the search. Rockwood Br. at 35–36. But whether the information was known to the officers at the time of the search goes to the apparent-authority analysis, not the actual-authority analysis. *See Ayoub*, 498 F.3d at 541 (noting that the actual- and apparent-authority tests overlap when "the officers' impressions of the facts largely coincide[] with the objective facts"). We may consider evidence of Anthony's role when determining if he had actual authority to consent. Accordingly, Plaintiffs have not raised a question of material fact about Anthony's actual authority to consent.

Furthermore, Defendants have offered sufficient evidence for a reasonable jury to conclude that Anthony also had apparent authority to consent to the search of Rockwood. During the search, it was apparent that Anthony was the adult son of Jack and that he was the sole employee then present at the business. Anthony also had access to the entire Rockwood premises. He did not express any hesitation about allowing the officers onto the premises to

conduct the search, nor did he call his father to seek permission. Indeed, Anthony called Jack only when the officers asked about the boat trailer, which was located at Jack's house. R. 52-10 (A. Poli Dep. at 62) (Page ID #1694). When reached, Jack did not object to Anthony having allowed the officers on the premises; to the contrary, Jack later allowed the officers to search part of his house and inspect the boat trailer. R. 52-2 (J. Poli Dep. at 62, 75) (Page ID #1375, 1378). Moreover, throughout the search, Anthony conveyed knowledge of the business and of the Sheriff's Office's assets held at Rockwood. *See* R. 52-10 (A. Poli Dep. at 36, 46–48) (Page ID #1687, 1690) (explaining that the cars in the north lot were owned by Rockwood Auto and that the boat trailer was located at Jack's house). The combination of Anthony's role as Jack's adult son, Anthony's intimate familiarity with the business and access to the premises, and Jack's lack of objection would lead a reasonable officer to conclude that Anthony had authority to consent. *See United States v. King*, 627 F.3d 641, 648 (7th Cir. 2010) (finding no error in the district court's conclusion that an employee who held keys to a restaurant, knew the alarm code, and opened the small restaurant by himself had apparent authority to permit a search); *United States v. Sells*, 496 F.2d 912, 913–14 (7th Cir. 1974) (upholding district court's conclusion that an employee of a "used car/junk car dealership" could validly consent to a search when the owner's son identified the employee as the person "in charge"). Plaintiffs object that the officers knew only that Anthony was Jack's adult son. We disagree. The officers observed Anthony's behavior and circumstances that would have led them to reasonably conclude that Anthony had authority to consent.

In sum, Defendants have provided evidence sufficient for a jury to conclude that Anthony had actual and apparent authority to consent to the search of Rockwood. Plaintiffs have not raised any genuine factual dispute. So, we reject Plaintiffs' argument that Anthony was not authorized to consent to the search of the business.

## B. Scope

We turn next to whether the search exceeded the scope of Anthony's consent. When consent is the basis for validating a warrantless search, "the scope of the consent given determines the permissible scope of the search." *Garrido-Santana*, 360 F.3d at 575 (quoting *Gant*, 112 F.3d at 242). To determine the scope of consent under the Fourth Amendment, we

apply an "'objective' reasonableness" standard and ask: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "To determine what a reasonable person would have understood the scope of their consent to be, we look to the 'expressed object' of the search or seizure." *United States v. Lewis*, 81 F.4th 640, 652 (6th Cir. 2023) (quoting *Jimeno*, 500 U.S. at 251). "[T]he consenting party may limit the scope of that search, and hence at any moment may retract his consent." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

The search here did not exceed its expressed object. It is undisputed that, upon arriving at Rockwood, the officers identified the object of their search: conducting an audit of Sheriff's Office property. R. 52-10 (A. Poli Dep. at 29) (Page ID #1686) ("[The Sheriff] said they were there to do an audit and they needed to look at the cars."); R. 52-8 (Preadmore Dep. at 56) (Page ID #1632); R. 52-7 (Goodnough Dep. at 124) (Page ID #1554). Everything the officers did at Rockwood fell within that scope: they searched Rockwood for property owned by the Sheriff's Office, including cars used for transport and parts, a generator, and a boat trailer. R. 52-7 (Goodnough Dep. at 104–29) (Page ID #1549–55); R. 52-10 (A. Poli Dep. at 29–48) (Page ID #1686–90).

Plaintiffs concede that Anthony consented to the officers "entering onto Rockwood's property" and that he "accompanied them in their initial search of the premises." Rockwood Br. at 36. But they argue that the scope of the search was limited to determining whether a few specified cars were located on the property and contend that the officers exceeded that scope by searching the rest of the lot. *Id.* at 37. Specifically, Plaintiffs object to the officers searching the north lot, which contained several marked patrol cars, and taking down the VIN numbers from those cars, even after Anthony advised that those cars belonged to Rockwood Auto. *Id.* This argument falls flat, because Goodnough's expressed object was conducting an audit of the property, not looking for certain vehicles. Accordingly, Anthony was reasonably on notice that Goodnough intended to look for all the Sheriff's Office property that might be on site. *See Jimeno*, 500 U.S. at 251–52.

Moreover, the evidence in the record indicates that Goodnough looked for Sheriff's Office property during the search. Specifically, Goodnough went to the north lot because he was

concerned that marked Crown Victoria patrol cars located in that lot were still owned by the Sheriff's Office.  R. 52-7 (Goodnough Dep. at 116–17, 156) (Page ID #1552–53, 1562).  It was therefore within the scope of the announced search to continue looking in the north lot.

Plaintiffs also argue that Anthony retracted his consent by stating that the cars in the north lot belonged to Rockwood Auto.  But Anthony's statement did not amount to a retraction of consent.  Anthony did not say he wanted the search to stop, nor did he otherwise try to end the search.  Anthony actually accompanied the officers throughout the trip to the north lot.  R. 52-10 (A. Poli Dep. at 39) (Page ID #1688).  Plaintiffs argue that Anthony was coerced to do so.  *See* Rockwood Br. at 38.  Yet, Plaintiffs provide no evidence that the officers did anything—apart from being present as law-enforcement officers—that would have led Anthony to feel coerced. Anthony stated at his deposition only that he "didn't think [he] had a choice.  [Goodnough] led." R. 52-10 (A. Poli Dep. at 39) (Page ID #1688).  But he does not suggest that the officers used any tactics that would have prevented him from ending the search.  *See United States v. Drayton*, 536 U.S. 194, 204–05 (2002) (rejecting the contention that the presence of a law-enforcement officer with a badge, uniform, or holstered firearm is coercive in the absence of force, intimidation, or threats).  Consent may be given by "words, gesture, or conduct."  *United States v. Coleman*, 458 F.3d 453, 458 (6th Cir. 2006) (citation omitted).  Anthony's continued guidance of the officers throughout the property shows that he consented to the entire search.  *See Garrido-Santana*, 360 F.3d at 576 (noting that "although defendant had the opportunity to do so, he never objected to the officers' search of the gas tank and, thus, neither clarified that the scope of his sweeping consent excluded such a search nor revoked his consent").  Therefore, we reject the argument that the search extended beyond its express object.

## C.  Pretext

Plaintiffs finally argue that the purported object of the searches of Rockwood and Jack's pole barn—conducting an audit of Sheriff's Office property—was simply pretext for "launch[ing] a baseless MSP investigation" and depriving Rockwood Auto and Rockwood Towing of their work for Monroe County.  Rockwood Br. at 43, 67.  However, Plaintiffs have failed to raise any genuine dispute of fact as to the Sheriff's Office reason for conducting the searches.

Monroe County has put forward substantial evidence that the searches were conducted as part of an audit of Sheriff's Office property. Goodnough testified in a deposition that he received advice from the state sheriffs' association to audit the assets as soon as he assumed office. R. 52-7 (Goodnough Dep. at 97–99) (Page ID #1547–48). He was aware that some cars and a boat trailer were being stored at Rockwood and wished to see what was there. *Id.* at 104–15 (Page ID #1549–52). During the search of Rockwood, he was surprised by what he found. First, several Sheriff's Office vehicles, apparently owned by Rockwood Auto, were still covered in official decals and contained law-enforcement equipment. *Id.* at 116–18 (Page ID #1552–53). And second, a boat trailer owned by the Sheriff's Office was being stored at Jack's personal residence. *Id.* at 128–29 (Page ID #1555). After finding these, as well as a good-looking boat that had been sold for scrap under the prior administration, Goodnough contacted the sheriffs' association, which instructed him to notify the state police. *Id.* at 132–72 (Page ID #1556–66).

Plaintiffs, by contrast, offer no evidence to support their assertion that the searches were part of a bad-faith effort to strip Rockwood Auto and Rockwood Towing of their Monroe County business. Plaintiffs' argument boils down to dissatisfaction that the search turned up information that raised questions about Plaintiffs' practices under the prior sheriff's administration, which resulted in a criminal investigation, and which preceded the removal of Plaintiffs' work for Monroe County. The fact that consequences followed the search does not imply that the consequences motivated it. *See Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004) (requiring the non-moving party to provide "more than mere speculation, conjecture, or fantasy" to defeat a motion for summary judgment (citation omitted)).

Moreover, even if the search was pretextual, that would not necessarily invalidate the consent that Jack and Anthony gave to the searches. "[A] ruse or officers' undercover activity does not usually violate individuals' rights." *United States v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008). Trickery may be relevant to determining whether a party gave valid consent, because "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *see United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) ("Relevant considerations include . . . deception [or] trickery . . . ."

(citation omitted)).  In rare cases, we have recognized that trickery can invalidate consent where the officer led the individual to believe that he had "no choice but to invite" the officer in. *Hardin*, 539 F.3d at 425 (citation omitted).

Plaintiffs have not demonstrated that any trickery affected Anthony's or Jack's voluntary consent to the search.  Perhaps, had Anthony or Jack known that the officers were suspicious of their prior contacts with Monroe County, they might not have let them in.  But telling the property owner that the officers were conducting an audit, when the officers were in fact launching an investigation, is not the type of coercive lie that we have previously recognized as undercutting otherwise valid consent. *See id.*  Moreover, there hardly seems to be any unfairness in holding Anthony to his consent when he was told that the officers were looking for Sheriff's Office property held at Rockwood, and that is in fact what the officers proceeded to seek. *See* 4 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 8.2(n) (6th ed. 2024).[3]

Hence, Plaintiffs have failed to demonstrate that a reasonable jury could conclude that Defendants violated their Fourth Amendment rights.  Thus, the district court correctly granted summary judgment to Defendants on the Fourth Amendment claim.

## IV.  EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment forbids government discrimination which "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference."

---

[3]Plaintiffs also argue that the search of Jack's pole barn was pretextual because Goodnough "never explicitly asked Jack if they could search the barn nor whether he consented to such a search, only that they 'needed' to take measurements of the boat trailer to ensure it would fit a new boat MCSD was purchasing."  Rockwood Br. at 43 (quoting R. 52-2 (J. Poli Dep. at 79) (Page ID #1379)).  They contend that it was inappropriate for Goodnough to look at or photograph the boat on top of the trailer.  This argument is also meritless because Jack admitted in a deposition that Goodnough told him that Goodnough was conducting an audit of Sheriff's Office property.  R. 52-2 (J. Poli Dep. at 117) (Page ID #1389) (recalling Goodnough stating on the phone "probably four five times that it was just an audit.  I wasn't under an investigation; he was simply conducting an audit").  Observing the boat—which was apparently sold as scrap, although it appeared to be in seaworthy condition—is consistent with that purpose.  Moreover, Jack was present throughout the search, including when the photos were taken. *Id.* at 79–80 (Page ID #1379).  But Jack never asked what photos were being taken, nor did he ask the officers to leave. *See id.* at 80–81 (Page ID #1379–80).  Under these circumstances, a jury could not conclude that Jack's consent was invalid.

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 788 (6th Cir. 2005). The last category is known as a class of one. A class-of-one plaintiff can succeed by showing that it was "intentionally singled out by government for discriminatory adverse treatment." *Id.* The test is (1) whether the government "intentionally treated" the plaintiff "differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)).

The first prong of the test looks to whether the individual faced intentional discrimination. A plaintiff may prove intentional discrimination by direct or circumstantial evidence. *Id.* at 527–28. Commonly, plaintiffs choose the circumstantial route by proving that they were "treated differently than those similarly situated in *all material* respects." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (emphasis added). Different treatment of materially identical individuals raises an inference of intentional discrimination. *Green Genie*, 63 F.4th at 528.

The second prong looks to whether there is a reason for the government's decision to discriminate. *See TriHealth*, 430 F.3d at 790–91. The plaintiff bears a "heavy burden" of demonstrating the irrationality of the government's action. *Id.* at 791. On rational-basis review, governmental action "comes to us bearing a strong presumption of validity." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). The burden is on the plaintiff to "negativ[e] every conceivable reason for the government's actions or [to] demonstrate[e] that the actions were motivated by animus or ill-will." *Loesel*, 692 F.3d at 462 (citation omitted). Accordingly, the government entity "has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and 'may be based on rational speculation unsupported by evidence or empirical data.'" *TriHealth*, 430 F.3d at 790 (quoting *Beach Commc'ns*, 508 U.S. at 315). We "will not overturn government action 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [we] can only conclude that the [government's] actions were irrational.'" *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005) (second alteration in original) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000)).

Plaintiffs assert that Defendants violated their equal-protection rights by awarding the fleet-maintenance contract to Gerweck Nissan and reducing their share of the Monroe County towing business without a rational basis and because of Goodnough's personal animus against Jack.

## A. Fleet-Maintenance Contract

We start with the claim that Defendants violated Plaintiffs' equal-protection rights by awarding the fleet-maintenance contract to Gerweck Nissan. We need not dwell on the parties' disputes about whether Rockwood Auto and Gerweck Nissan were similarly situated yet treated differently, because a rational basis supports the selection of Gerweck Nissan. Defendants assert that Gerweck Nissan offered a lower bid. Monroe Cnty. Br. at 44. The record supports Defendants' rationale. *See* R. 42-10 (Bid Comparison) (Page ID #923). On five of six items compared, Gerweck Nissan bid a lower price. *See id.* For example, Gerweck Nissan would charge only $650 to service brakes, while Rockwood Auto would charge $850.50. *Compare* R. 52-13 (Gerweck Bid with Clarifications) (Page ID #1735–37), *with* R. 42-10 (Rockwood Bid) (Page ID #927). Gerweck Nissan would charge $56.90 for a full synthetic oil change while Rockwood Auto would charge $72. *Id.*

Plaintiffs have not presented evidence to negate this rationale. *See Loesel*, 692 F.3d at 462. Plaintiffs argue that the Gerweck Nissan's bid and Rockwood Auto's bid are like apples and oranges, so questions of material fact remain as to which bid was higher and which bid was lower. Rockwood Br. at 51–52. They argue that "many of the categories have a different method of computing the ultimate price on the given item." *Id.* at 51; *compare* R. 52-13 (Gerweck Bid with Clarifications) (Page ID #1735–37), *with* R. 42-10 (Rockwood Bid) (Page ID #927–29). Raising questions about the difficulty with comparing the two bids does not satisfy Plaintiffs' burden. "Under rational basis review . . . the burden falls entirely to Plaintiff to show there is no rational basis, not the other way around." *Club Italia Soccer & Sports Org. v. Charter Township of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006). As we have explained, a

comparison of the two bids supports the contention that Gerweck Nissan's was lower.  Plaintiffs have offered only argument, not evidence, to the contrary.[4]

Plaintiffs further argue that questions of material fact remain about "whether Goodnough's markups of the Gerweck bid were simply 'clarifications' or whether they amounted to an impermissible re-write of the bid."  Rockwood Br. at 50.  Plaintiffs note that Rockwood Auto was not contacted to revise its bid, including to delete a $3 fee for tire removal.  Any disputes remaining here, however, are not material.  *See Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 879 (7th Cir. 2025) (rejecting class-of-one argument based on different treatment in the process of obtaining information from potential bidders).  Even if Gerweck Nissan was treated differently and was allowed to rewrite its bid, Defendants still had a rational basis for selecting Gerweck Nissan's clarified bid over Rockwood Auto's original one.  Plaintiffs are "unable to disprove all conceivable justifications" for that selection.  *TriHealth, Inc.*, 430 F.3d at 792.[5]

Plaintiffs alternatively argue that Defendants selected Gerweck Nissan over Rockwood Auto because Goodnough harbored personal animus against Jack.  This argument fails at the outset because the record evidence suggests that Bosanac was the final decisionmaker on the contract award, and there is no evidence that Bosanac harbored animus against Jack.  R. 52-7 (Goodnough Dep. at 239) (Page ID #1583); R. 52-4 (Bosanac Dep. at 79–80) (Page ID #1446).[6]  Even assuming that Goodnough made or influenced the decision to select Gerweck Nissan over Rockwood Auto, Plaintiffs' allegation that Goodnough harbored personal animus against Jack amounts to speculation.  Plaintiffs point to an email from Goodnough responding to a message

---

[4]Plaintiffs emphasize a slightly lower quote for tire repairs and Goodnough's removal of a $3 tire removal fee from Gerweck Nissan's quote.  But such repairs are among the least expensive items on the service list and do not raise a question of material fact about the rationality of the decision.  *Compare* R. 42-10 (Rockwood Bid) (Page ID #927), *with* R. 52-13 (Gerweck Bid with Clarifications) (Page ID #1735).

[5]At oral argument, Defendants also argued that Rockwood Auto's questionable practices offered another rational basis for declining to award them the fleet-maintenance contract.  Because this argument was not raised below or in the briefs on appeal, we do not consider it here.

[6]To the contrary, there is evidence that Bosanac has personal animus against the owner of Gerweck Nissan.  *See* R. 52-4 (Bosanac Dep. at 73) (Page ID #1444) ("I don't like John [Gerweck], period.  I've had it out with him . . . [f]or not mowing the property next to my residence.").

from Anthony concerning changes to the non-preference tow list that were unfavorable to Rockwood Towing.  R. 52-15 (Dec. 2021 Emails) (Page ID #1742).  On December 29, 2021, Goodnough wrote, in part:

> I am not going to go into detail, but I will tell you that in the past 12 months I fielded numerous complaints against your father for his lack of professionalism towards Sheriff's Office employees and one complaint from a citizen regarding a fee.  In addition, there is an ongoing criminal investigation involving your father and damaging 'kicking' a customer's vehicle hence the very reason for 3.4 in the new policy.  If you are managing Rockwood Towing, I encourage you to put your father on notice that his actions towards Sheriff's Office employees will NOT be tolerated.

*Id.* (Page ID #1743).

This email would not permit a reasonable jury to conclude that the change in fleet-maintenance vendors was motivated by Goodnough's personal animus against Jack.  To begin, this email was written several months after the decision was made, so it has minimal probative value as to Goodnough's motivation for switching fleet-maintenance contractors.  The email also refers to an incident which post-dated the contract award by several months.  *See* Rockwood Br. at 26 n.5 (acknowledging the incident occurred in November 2021).  This email suggests at most that Goodnough had a negative professional opinion of Jack based on his treatment of customers and Sheriff's Office employees.  "To demonstrate animus or ill will under *Olech*, a plaintiff must prove that the challenged government actions were motivated by personal malice unrelated to the defendant's official duties."  *Klimik v. Kent Cnty. Sheriff's Dep't*, 91 F. App'x 396, 401 (6th Cir. 2004) (citing *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000)); *see Olech*, 528 U.S. at 566 (Breyer, J., concurring in the result) (contending that the government official's vindictiveness and "illegitimate desire" to target the plaintiff [someone]" would demonstrate animus or ill will).  Selecting a different vendor because the government official had negative experiences working with the initial vendor is not the kind of animus that would show unconstitutionally discriminatory action.  To the contrary, those negative experiences themselves provided a rational basis for the County's rejection of Rockwood's bid.  For these reasons, summary judgment was properly granted to Defendants on Plaintiffs' equal-protection claim concerning the fleet-maintenance contract.

## B.  Non-Preference Towing List

We move on to Plaintiffs' assertion that Defendants intentionally discriminated against them by removing some of Rockwood Towing's positions on the non-preference towing list. The towing-list claims relate to Rockwood Towing's responsibilities in the county's designated geographic Areas Four, Five and Six.

Rockwood Towing historically held a position on the rotational towing list for Area Four in Monroe County.  Before Goodnough altered the towing rotation as reflected in the January 2022 list, Rockwood Towing split the work with four other towing companies.  After the January 2022 changes, Rockwood Towing lost its place on the Area Four list, and the other four companies remained.  Plaintiffs have not raised a triable issue of fact about whether Rockwood Towing's removal from Area Four was the result of irrational, intentional discrimination.

Plaintiffs suggest that they are similarly situated to the other towing companies located in Area Four.  But Defendants say that Rockwood Towing is located farther away from Area Four than any other towing company assigned to that area.  Plaintiffs do not dispute the relative distances.  Plaintiffs challenge Goodnough's failure to evaluate the distance between *other* towing companies and the areas to which they were assigned.  Rockwood Br. at 58.  But Plaintiffs have not demonstrated that they were similarly situated to those companies, or that those other areas were similar to Area Four.

Even assuming that Plaintiffs identified a similarly situated comparator who was treated differently, Plaintiffs have failed to negate Defendants' rational basis for removing them from Area Four.  As Goodnough explained in a December 29, 2021, email to Anthony:  "[A]rea 4 is saturated and it is not efficient to have a company who is 10 miles away service an area with multiple providers within three miles or less."  R. 52-15 (Dec. 2021 Emails) (Page ID #1743); *see* R. 52-7 (Goodnough Dep. at 184) (Page ID #1569) (stating that it "wasn't efficient" to have Rockwood Towing respond to Area Four).  Goodnough further asserted that he had received complaints from deputies that Rockwood Towing had slow service.  R. 52-7 (Goodnough Dep. at 183–87) (Page ID #1569–70).  Distance to travel and timeliness are rational reasons for selecting one tow company over another.  Again, Plaintiffs do not dispute that Rockwood Towing is

located the farthest of any of the towing companies in Area Four, and they do not dispute that timeliness is a valid reason to select one towing company over another. Plaintiffs argue that some of the other towing companies in Area Four had a reputation for slow response times. R. 52-1 (Kemp Dep. at 174–75) (Page ID #1355). But this does not suffice to create a triable question about the rational basis to remove Rockwood Towing from Area Four.

Turning next to Area Five and Area Six, Plaintiffs argue that they were discriminated against when Defendants took away their exclusive hold by adding another towing company to those areas. Plaintiffs argue that they were the only towing company to lose an exclusive area. Even assuming that this is true,[7] Plaintiffs still fail to overcome Defendants' rational basis for ending their exclusivity. Defendants have asserted that they added towing companies to those areas so that there would be backup in each zone. As Goodnough stated in the email to Anthony: "not one agency is the sole provider in any given area. It is imperative we have more than one company available to respond as requested; we will not allow one agency to monopolize towing in any given area." R. 52-15 (Dec. 2021 Emails) (Page ID #1743); *see* R. 52-7 (Goodnough Dep. at 176–77) (Page ID #1567). Plaintiffs offer no argument why this was an irrational basis for adding towing companies to Area Five and Area Six.

Finally, Plaintiffs argue that the decision to alter the towing list was motivated by Goodnough's personal animus against Jack. However, as with respect to their fleet-maintenance claim, Plaintiffs have not shown that Goodnough's decisions were motivated by any *personal* ill will against Jack, rather than a negative opinion of his towing operation.[8] So, summary judgment was properly granted to Defendants on the equal-protection claim.

---

[7]Because the towing lists changed over time, it is difficult to discern when and for how long Rockwood Towing was the only towing company to hold exclusive zones. It appears that, for at least some period, Owen's Towing also had an exclusive hold on Area Seven, which ended with the latest tow policy. *See* R. 42-13 (Pre-2021 Tow List) (Page ID #962); R. 52-19 (9/24/21 Tow List) (Page ID #1782); R. 52-22 (1/24/22 Tow List) (Page ID #1798).

[8]Plaintiffs insinuate throughout that Goodnough made changes to the fleet-maintenance contract and towing lists to favor his personal friends and political supporters. Plaintiffs point us to no specific evidence that any of the towing companies or their owners supported Goodnough's campaign, or that he had personal relationships with any of them. There is record evidence supporting the assertion that John Gerweck, the owner of Gerweck Nissan, is a close friend of Goodnough's brother and that Gerweck bought a ticket to a fundraising dinner supporting Goodnough's campaign. *See* R. 52-7 (Goodnough Dep. at 192–93) (Page ID #1571); R. 52-11 (Gerweck Dep. at

## V.  DUE PROCESS

The Fifth and Fourteenth Amendments protect against deprivations of protected interests without due process of law.  U.S. Const. amends. V, XIV, § 1.  A publicly bid contract can give rise to a protected property interest in two ways.  "A bidder can either show that it actually was awarded the contract and then deprived of it, or that, under state law, the County had limited discretion, which it abused, in awarding the contract."  *Enertech Elec., Inc. v. Mahoning Cnty. Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996).  "Abuse of discretion in this context implies an unreasonable, arbitrary, or unconscionable attitude[.]"  *Charlie's Towing & Recovery, Inc. v. Jefferson County*, 183 F.3d 524, 528 (6th Cir. 1999).  "[A]rbitrary means without adequate determining principle; and unreasonable means irrational."  *Id.*  If state law "limited the discretion of state officials as to whom the contract should be awarded" and the official nonetheless arbitrarily awarded the contract to a different bidder, a protected property interest would arise.  *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992).

Plaintiffs assert that Defendants deprived them of a property interest in the fleet-maintenance contract.  Before Monroe County put out the RFP for fleet maintenance, Rockwood Auto performed fleet-maintenance services for the Monroe County Sheriff's Office without a contract.  R. 52-2 (J. Poli Dep. at 33) (Page ID #1368).  Therefore, Plaintiffs do not attempt to argue that they were deprived of a preexisting contractual right.  Nor do Plaintiffs argue that they were awarded a contract that was subsequently revoked.  Instead, Plaintiffs argue that Defendants had limited discretion to award the fleet-maintenance contract and that they abused that discretion by awarding the contract to Gerweck Nissan.

---

11–14) (Page ID #1711–12); R. 52-20 (Campaign Contributions at 4) (Page ID #1787).  But merely showing that Gerweck Nissan might have benefited from its relationship to Goodnough does not suffice to prove that Rockwood Auto was discriminated against for its lack of a comparable relationship with him.  *See Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 419 (5th Cir. 2015) (holding that evidence of discrimination "*in favor of*" companies that bribed local officials was "not sufficient to show that [the plaintiff company] was discriminated *against*"); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 687 (10th Cir. 2012) (requiring that the plaintiff "point to evidence that the defendants enforced their extortionate rule with the purpose of discriminating against those who wouldn't comply—because of, not in spite of, its disparate effect on that class of persons"); *cf. Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705, 718 (7th Cir. 2013) (holding that property owner stated a claim that he was discriminated against for contributing to the campaign of disgraced lawmaker).

We note at the outset that the parties have not identified any state law or local ordinance that limits Monroe County's discretion to award the fleet-maintenance contract. Our prior cases rested on the interpretation and application of such legal codes. *See Enertech*, 85 F.3d at 260; *Charlie's Towing*, 183 F.3d at 527–28. Instead, the parties focus on whether the RFP was self-limiting—i.e., whether Monroe County elected to cabin its discretion by the terms of the RFP. We express no view on whether a self-imposed limit in an RFP can limit the public entity's discretion in a manner that gives rise to a property interest. For, even if it could, Plaintiffs have failed to raise any genuine dispute over whether the RFP did so here.

In the RFP, Monroe County "reserve[d] the right to accept or to reject any and all proposals, to waive any irregularities and to make an award that is determined by the County of Monroe to be in the best interest of the County." R. 42-9 (RFP) (Page ID #911). In so doing, Monroe County retained discretion over the criteria for awarding a bid. *See Charlie's Towing*, 183 F.3d at 527 (holding that government entity had discretion when it had the right to "reject any or all bids"); *Leo J. Brielmaier Co. v. Newport Hous. Auth.*, 173 F.3d 855, at *5 (6th Cir. 1999) (unpublished table opinion) (same); *Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1130 (8th Cir. 2016) (same). The RFP did not suggest that the bid would be awarded to the lowest bidder or would be based on any other specific qualification. *See United of Omaha*, 960 F.2d at 34 (discussing a Georgia law, which created a property interest by requiring the award of public contracts to the "lowest responsible bidder" (citation omitted)).

Plaintiffs argue that Monroe County limited its discretion by setting forth criteria and scoring procedures in the RFP. The RFP indicated that bids would be scored based on responsiveness, experience, size, competence, and other factors. R. 52-12 (Original Gerweck Bid) (Page ID #1730–31). The evidence in the record does not indicate whether Defendants followed those procedures. But for substantive-due-process purposes, it does not matter because "the failure of a governmental body to follow a given procedure does not create a property right." *Charlie's Towing*, 183 F.3d at 528. Plaintiffs also note that the qualification form states that "[o]nly firms meeting the mandatory criteria," which included timely submission, compliance with instructions, and the lack of a conflict of interest, "will have their proposal evaluated." R. 52-12 (Original Gerweck Bid) (Page ID #1730). To the extent this provision

limits Monroe County's discretion, it limits awards to compliant bids. However, Plaintiffs have not demonstrated how Gerweck Nissan's bid was noncompliant. Accordingly, Plaintiffs have not demonstrated that they had a property interest in the contract, and summary judgment was properly granted to Defendants on the due-process claim.

## VI. MUNICIPAL LIABILITY

Plaintiffs also raised a municipal-liability claim under *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978). That claim rested on the theory that Goodnough's unconstitutional actions could be attributed to Monroe County, because he is a "municipal policymaker[]." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *see* Rockwood Br. at 64 ("[T]he County could be held liable to the extent even a single decision or action by Goodnough violates Plaintiffs-Appellants' rights."). Because Plaintiffs have failed to show that any fact issue remains on the individual constitutional claims, summary judgment is appropriate for Monroe County on the *Monell* claim, as well.

## VII. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.